## UNITED STATES v. PATTERSON et al.

### (Circuit Court, D. Massachusetts. February 28, 1893.)

### No. 1,215.

1. MONOPOLIES—INDICTMENT—CONSPIRACY—ACT JULY 2, 1890.
   St. U. S. 1890, c. 647, declares illegal contracts, combinations, or conspiracies in restraint of trade, and makes it a misdemeanor for any person to make or engage in them, or to monopolize, or attempt or conspire with others to monopolize, any part of the trade or commerce among the several states or with foreign nations. *Held,* that in an indictment under this chapter it is not sufficient to declare in the words of the statute, but the means whereby it is sought to monopolize the market must be set out, so as to enable the court to see that they are illegal.

2. SAME.
   Allegations of what was done in pursuance of an alleged conspiracy are irrelevant in an indictment under this statute, and are of no avail either to enlarge or to take the place of the necessary allegations as to the elements of the offense.

3. SAME—SCOPE OF THE STATUTE.
   The words "trade and commerce," as used in the act, are synonymous. The use of both terms in the first section does not enlarge the meaning of the statute beyond that employed in the common-law expression, "contract in restraint of trade," as they are analogous to the word "monopolize," used in the second section of the act. This word is the basis and limitation of the statute, and hence an indictment must show a conspiracy in restraint by engrossing or monopolizing or grasping the market. It is not sufficient simply to allege a purpose to drive certain competitors out of the field by violence, annoyance, intimidation, or otherwise.[1]

4. SAME—ACTS OF VIOLENCE.
   Where counts in such indictment allege a purpose of engrossing or monopolizing the entire trade in question, acts of violence and intimidation may be alleged as the means to accomplish the general purpose.

At Law. Indictment in 18 counts against John H. Patterson and others for violating the act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," (26 St. p. 209, c. 647.) Heard on demurrer to the indictment. Judgment overruling the demurrer as to counts 4, 9, 14, and 18, and sustaining it as to the others.

The sections of the statute immediately in question here are the following:

---

[1] See, however, the case of U. S. v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. Rep. 994, decided in the circuit court for the eastern district of Louisiana by Judge Billings, March 25, 1893, in which it was held that the statute included combinations of workmen, who, by means of a strike, combined with threats, intimidations, and violence, caused a cessation of business, which resulted in delaying, interrupting, and restraining interstate and foreign commerce.

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations, is hereby declared to be illegal.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The first ten counts of the indictment are for engaging in a conspiracy in restraint of trade and commerce among the several states in violation of the first section of the act. The last eight counts are for a conspiracy to monopolize a part of the trade and commerce among the several states, in violation of the second section of the act.

The first half of each set of counts allege the conspiracy, setting forth the means with various degrees of particularity, but without alleging overt acts. The second half of each set repeat the allegations of the first half, adding also allegations of overt acts.

In all the counts the conspiracy charged is described as being a conspiracy, (in the first set of counts in restraint of trade, and in the second set of counts to monopolize trade,) not by means of any contract or combination operating upon the parties to the conspiracy themselves, but by means of destroying or preventing the trade of others; so that the trade to be restrained was other people's trade, and the monopoly sought was to be secured by driving other people out of business.

The first count of each set charges that the object of conspiracy was to accomplish this end by fraud and misrepresentation, deceit, threats, intimidation, obstruction, and molestation, and other unlawful, oppressive, and vexatious means; the second charges that it was to be attained by preventing other persons from carrying on business; the third, that it was to be attained by preventing others from engaging in business by means of threats, intimidation, etc.; the fourth, that it was to be attained by preventing others from carrying on business by means of harassing and intimidating competitors, by threatening them, by causing them and their agents to be assaulted and injured, by inducing their agents and employes to leave their employment, by employing spies to obtain knowledge of their business secrets, by harassing and intimidating purchasers, by inducing purchasers to break their contracts and refuse to pay sums owing to competitors, by agreeing to maintain and maintaining persons so refusing to pay in the defense of suits against them, by delaying and impeding the progress of suits, by threatening prospective purchasers with annoyance, molestation, and injury in the event of their purchasing from competitors, by causing persons to call upon such purchasers repeatedly and unnecessarily to occupy their time, and dissuading and persuading them from buying from competitors, by causing great numbers of vexatious and oppressive actions for the infringement of patents to be brought against such

purchasers, by threatening intending purchasers from competitors with suits for infringement of patents, and thereby, and by other similar means, making it impossible for competitors to continue business; the fifth count of the first set gives the names of certain competitors who are engaged in interstate trade, and sets forth with still greater particularity the means by which it was the object of the conspiracy to destroy the business of those competitors.

Frank D. Allen, U. S. Atty.

. *First.*

## MEANING OF THE ACT.

In Heydon's Case, 3 Coke, 7, the barons of the exchequer lay down the following rules: "For the sure and true interpretation of statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discerned and considered: (1) What was the common law before the making of the act? (2) What was the mischief and defect against which the common law did not provide? (3) What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth, and (4) the true reason of the remedy."

These questions will be discussed in their order as relating to the statute now under consideration.

### (A) STATE OF THE LAW BEFORE THE PASSING OF THE ACT.

Two questions naturally present themselves here: (1) What was the common law in regard to the subject-matter of the statute? and (2) what was the relation of the United States government and of the United States courts to that law?

The terms in the statute which naturally call for comment in this case, are the following: (a) "Contract," (b) "combination," (c) "conspiracy," (d) "restraint of trade or commerce," (e) "trade or commerce among the several states or with foreign nations," (f) "monopolize."

(a) "Contract." The meaning of this word is elementary, and it is not necessary to discuss it, except in connection with the following words, "in restraint of trade."

(b) "Combination." This word is used in the statute in a broader sense than the words "contract" on the one hand and "conspiracy" on the other. It has no technical, legal signification; and the words, "combination in the form of trust or otherwise," are intended to cover broadly any sort of a union of different persons, even though such union may not be sufficient to answer to the technical term "conspiracy," and may not include a binding contract. As modified by the subsequent words, "in restraint of trade," it refers to that class of cases where there is no binding contract, and perhaps includes certain cases in which there are no legal means contemplated so as to make it a conspiracy, and no sufficient union or agreement to make either a monopoly or a contract.

(c) "Conspiracy." This is a word of well-known legal signification. It is sometimes used to indicate simply the coming together and agreeing of persons, but in a penal statute is clearly to be construed as including the idea of illegality, created either by the illegal character of the ultimate object sought to be attained, or by the illegal character of the means by which it is contemplated that the desired result shall be accomplished, or both of these together. It is well settled at common law, and has been from early times, that conspiracies to accomplish a thing illegal in itself, and also conspiracies to accomplish a thing lawful in itself by unlawful means, are criminal. In U. S. v. Lancaster, 44 Fed. Rep. 896, the court say: "A conspiracy is an unlawful confederacy or combination of two or more persons to do an unlawful act, or have accomplished an unlawful purpose." Com. v. Hunt, 4 Metc. (Mass.) 123; Rex v. Gray, 3 Harg. St. Tr. 519; Spies v.

People, 122 Ill. 212, 213, 12 N. E. Rep. 865, 17 N. E. Rep. 898; 3 Greenl. Ev. § 189; Washb. Crim. Law, (2d Ed.) 42, etc. It is unnecessary to enter with nicety into the question of just what ends or means are sufficiently unlawful to render a conspiracy criminal, since it is quite clear that a conspiracy which includes in the means for its accomplishment threats and intimidation, the committing of assaults, the maintenance of actions, and the inducing of parties under contract to break their contracts, is criminal in character. Nor is it necessary to endeavor to discriminate carefully between conspiracies which are civilly actionable and those which are criminal, since it is obvious that a criminal conspiracy is also civilly actionable if anything is done under it resulting in injury to the party complaining.

(d) "Restraint of trade or commerce." These words modify each of the words "contract," "combination," and "conspiracy." Taken in connection with the word "contract," they point to a well-known legal conception, viz. "contract in restraint of trade." A contract, the total effect of which is to restrain trade, is void; but if the restraint upon the trade of one party to the contract be no greater than is necessary to protect some interest of the other acquired by the contract, it is evident that the contract encourages the trade of one party as much as it restrains that of the other, and hence the public is not injured and the contract is valid. Upon this general principle it may be laid down that—

(1) An agreement for the restraint of the trade of one of the parties thereto is valid if limited, as regards time, space, and the extent of the trade, to what is reasonable under the circumstances of the case.

(2) An agreement for the restraint of the trade of one of the parties thereto is invalid unless so limited.

Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553; Navigation Co. v. Winsor, 20 Wall. 64. See, also, Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. Rep. 658; Craft v. McConoughy, 79 Ill. 346; Western Union Tel. Co. v. Burlington & S. W. Ry. Co., 11 Fed. Rep. 1, and note; Hilton v. Eckersley, 6 El. & Bl. 47, 66; Rousillon v. Rousillon, 14 Ch. Div. 351; Collins v. Locke, L. R. 4 App. Cas. 674; Mallan v. May, 11 Mees. & W. 653; Palmer v. Stebbins, 3 Pick. 188, 193.

It will be obvious that in the case put the trade is restrained by the provisions of the contract itself, and is necessarily the trade of one or more of the parties to the contract. A contract between A. and B. cannot, in and of itself, restrain the trade of C. A. and B. may agree to restrain the trade of C., but such an agreement is a contract to restrain, not a contract in restraint of trade. As to such a contract three propositions may be laid down:

(1) If the parties to the contract have no business of their own similar to that to be restrained which the contract is intended to promote, the contract is illegal, and a conspiracy, not only because it restrains trade without the justification of promoting any other trade, but also because from the nature of the case it is an agreement to do another an injury maliciously and without cause.

(2) If A. and B. enter into an agreement for the principal purpose of promoting and extending their own business by none but lawful means, and without any intention to create a monopoly, such agreement is valid, although it have for its natural and expected result the injury and destruction of the business of C.

Such a contract, even when carried out, does not, on the whole, and viewed in its entirety, restrain trade at all, since it only operates to restrain C.'s trade in so far as it operates to promote the trade of A. and B.

(3) If A. and B. enter into an agreement for the purpose of promoting and extending their own business by restraining and destroying the business of C. by the use of unlawful means, such agreement is illegal, and a conspiracy, whether said unlawful means be of a criminal nature or not.

Such a contract is illegal and a conspiracy, both because of the illegal means contemplated, and because it does, when viewed in its entirety, contemplate a restraint of trade. The restraint of C.'s trade in this case is not simply the

result of the promotion of the trade of A. and B., and coextensive with it, but the extent of the restraint is wholly independent of the extent of the promotion, and may be absolute and entire, without any promotion at all. This must be true whenever the means are other than such as are intended and calculated to increase the trade of the contracting parties. Hence it was properly decided in Mogul Steamship Co. v. Macgregor, Gow & Co., 15 Q. B. Div. 476, 23 Q. B. Div. 598, [1892,] App. Cas. 25, that an agreement to drive a competitor out of business by lowering prices is not illegal. In this case shipping companies formed an agreement by which they endeavored to get the business of a certain port in China by placing their rates so low that another company could not compete with them, and was obliged to give up the business. The house of lords held that this was not an unlawful restraint of trade; that a trader could not be prevented from charging what he pleased, although he did it with a view of getting the trade himself, and of driving a competitor out of the business; but it was also laid down as unquestioned law that any such restraint effected by unlawful means would make the restraint illegal, and that a conspiracy to enforce restraint by such means would be criminal. In the queen's bench division. Bowen, L. J., (23 Q. B. Div. 614,) after stating that a merchant may lawfully compete with another by lowering his own prices to any extent, even with the intention of driving the other out of business, and then raising his own prices, says:

"No man, whether trader or not, can, however, justly damage another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden. So is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it. The intentional driving away of customers by a show of violence, the obstruction of actors on the stage by preconcerted hissing, the disturbance of wild fowls in decoys by the firing of guns, the impeding or threatening servants or workmen, the inducing persons under personal contracts to break their contracts,—all are instances of forbidden acts."

On page 616 he defines an "illegal combination" as "an agreement by one or more to do an unlawful act, or to do a lawful act by unlawful means," and cites two criminal cases in support of the proposition. On page 618, after stating that in cases where there is no intimidation, molestation, or other forms of illegality, acts may be done intentionally which will injure others in their business, provided they are done bona fide "in the use of a man's own property, in the exercise of a man's own trade," he continues: "But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights."

Particular attention is called to the cases cited by Bowen, L. J., in support of that part of his opinion which has been quoted. These cases are all quoted again in the house of lords, and amply sustain the statements that have been quoted. These cases are: Tarleton v. McGawley, Peake, 270, (driving away customers by show of violence;) Clifford v. Brandon, 2 Camp. 358, and Gregory v. Brunswick, 6 Man. & G. 205, (preconcerted hissing of actors;) Carrington v. Taylor, 11 East, 571, and Keeble v. Hickeringill, Id. 574, note, (disturbance of wild fowl in decoys;) Garret v. Taylor, Cro. Jac. 567, (threatening to vex prospective purchasers with suits;) Bowen v. Hall, 6 Q. B. Div. 333, and Lumley v. Gye, 2 El. & Bl. 216, (injuring persons by inducing others to break contracts with them.)

It is fully recognized in the foregoing cases that a contract which contemplates the doing of any unlawful acts, either as a means or an end to the injury of another, is a criminal conspiracy. It is elementary law, however, that a conspiracy need not involve any binding contract. The mere agreement in a common purpose is sufficient. It is obvious, moreover, that the very fundamental idea of "conspiracy" involves the agreement in a common purpose to injure some one or something outside of the conspirators themselves. The conspiracy may contemplate the acquisition of a benefit by the conspirators, but this is not what makes it unlawful, but the fact that it also necessarily contemplates injury to another. A contract, or even a combination, may refer exclusively to the property or persons of the contracting or

combining parties, but a conspiracy necessarily involves contemplated action against the persons or property of some outside person.

It follows that, if the meaning of the words, "conspiracy in restraint of trade," is to be determined by the common-law meaning of the words separately considered, it means a conspiracy to restrain the trade of some person other than the conspirators. Such a conspiracy is illegal, and, under this statute, criminal, if it intends a restraint of such trade by any means which do not in the nature of the case tend to promote the trade of the conspirators in a degree equal to the restraint, especially if such means are in and of themselves unlawful. The existence of unlawful means is conclusive, both as to conspiracy and as to the restraint of trade being unjustifiable. Clearly, a conspiracy to restrain trade by threats, intimidation, molestation, violence, and the other means alleged in this indictment, falls within this definition.

The whole history of the law of conspiracies in restraint of trade confirms this conclusion. 3 Steph. Hist. Crim. Law, pp. 202–227, upon "Conspiracies in Restraint of Trade;" Wright, Crim. Cons. 144–181; Ray, Contract. Lim. 334–411. An examination of the statutes that have been passed upon the subject of conspiracies in restraint of trade shows that they are aimed at any and all restraint, whether by employes or employers, which is endeavored to be enforced by threats, intimidation, or other unlawful means. Thus 38 & 39 Vict. c. 86, § 7, makes it an offense to use violence or to intimidate to compel another to do or abstain from doing any act which he has a legal right to abstain from or to do. So in New York it is made a misdemeanor "to prevent another from exercising a lawful trade or calling, or doing any other lawful act by force of threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; and also to permit any act injurious to the public health, to the public morals, or to trade or commerce, or for the perversion or obstruction of justice or of the due administration of the law." See, also, the statutes of other states, collected in Ray, Contract. Lim., supra."

It is true that most of the cases in the books are cases of intimidation on the part of workmen against their employers or against other workmen, or of employers against their workmen. But the language of the statutes and the principles of decision apply with equal force to conspiracies by any persons against the trade of other persons.

(e) "Trade or commerce among the several states or with foreign nations." This subject will be discussed later.

(f) "Monopolize." "Monopolies are much the same offenses in other branches of trade that ingrossing is in provisions, being a license or privilege allowed by the king for the sole buying and selling, making, working, or using of anything whatsoever, whereby the subject in general is restrained from that liberty of manufacturing or trading which he had before. They are said to differ only in this: that monopoly is by patent from the king, ingrossing by the act of the subject, between party and party, and have been considered as both equally injurious to trade and the freedom of the subject, and therefore equally restrained by the common law. By the common law, therefore, those who are guilty of this offense are subject to fine and imprisonment, the offense being malum in se, and contrary to the ancient and fundamental law of the kingdom; and it is said that there are precedents of prosecutions of this kind in former days. And all grants of this kind, relating to any known trade, are void by the common law." 1 Russ. Crimes, 350.

"It is said that all grants of this kind, relating to any known trade, are made void by the common law as being against the freedom of trade, and discouraging labor and industry, and restraining persons from getting an honest livelihood by a lawful employment, and putting it in the power of particular persons to set what prices they please on a commodity; all which are manifest inconveniences to the public." Hawk. P. C. c. 79, p. 203. East India Co. v. Sandys, Skin. 224.

"Hence, also, it seems that the king's charter empowering particular persons to trade to and from such a place is void, so far as it gives such persons an exclusive right of trading and debarring all others; and it

seems now agreed that nothing can exclude a subject from trade but an act of parliament." Hawk. P. C. 293, note 2.

In the Case of Monopolies, 11 Coke, 84, it was held that a grant by the crown of the sole making of cards within the realm is void; and it is said that "there are three inseparable incidents to every monopoly against the commonwealth, i. e.:

(1) "That the price of the same commodity will be raised, for he who has the sole selling of any commodity may and will make the price as he pleases.

(2) "That after the monopoly granted the commodity is not so good and merchantable as it was before, for the grantee, having the sole trade, regards only his private benefit, and not the commonwealth.

(3) "It is done to the impoverishment of divers artificers and others, who before, by the labor of their own hands in their art or trade, had maintained themselves and their families, who now will of necessity be constrained to live in idleness and beggary."

See, also, Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge, 11 Pet. 607; Slaughterhouse Cases, 16 Wall. 102.

As used in the statute, however, the word "monopolize" clearly does not refer to grants by the government, but to the accomplishment of the same result by private endeavor; and the word "monopoly," in the meaning it had at the passing of the act, and has now, is not confined to grants by the government. The essential idea of an unlawful monopoly is found not so much in the creating of a very extensive business in the hands of a single control as in the idea of preventing all other persons from engaging in such business, and thereby stifling competition. The evil of the grants from the crown lay not in the fact that they gave to the grantee a right to manufacture and sell, but in the fact that they prevented other persons from manufacturing and selling the same article. The evil is not the enlargement of one person's trade, but the destruction of the trade of all other persons in the same commodity.

(1) If A. and B. enter into an agreement to restrain trade for the purpose of creating a monopoly by destroying all competition, either by buying out all competitors or by driving them out of business, such agreement is illegal and void.

(2) A fortiori, an agreement to restrain trade for the purpose of creating a monopoly which looks to the crushing out of all competition by an unlawful means, whether criminal or otherwise, is invalid.

It is clear that monopolies have always been unlawful at common law. The difficulty is to distinguish between such unlawful monopolies and lawful rivalry in business. The following cases point out this line of distinction: Stanton v. Allen, 5 Denio, 434; Salt Co. v. Guthrie, 35 Ohio St. 666; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Craft v. McConoughy, 79 Ill. 346; Richardson v. Buhl, 77 Mich. 632, 43 N. W. Rep. 1102; Handy v. Railroad Co., 31 Fed. Rep. 689; Western Union Tel. Co. v. Burlington & S. W. Ry. Co., 11 Fed. Rep. 1; Dolph v. Machinery Co., 28 Fed. Rep. 553; People v. Chicago Gas Trust Co., 130 Ill. 268, 22 N. E. Rep. 798; Manufacturing Co. v. Klotz, 44 Fed. Rep. 721; More v. Bennett, (Ill. Sup.) 29 N. E. Rep. 888.

*Second.*

## RELATION OF THE UNITED STATES GOVERNMENT AND OF THE UNITED STATES COURTS TO THE SUBJECT-MATTER OF THE STATUTE.

(1) The congress of the United States is invested by the constitution with the power to regulate commerce between the several states, and with foreign nations, and with the Indian tribes. It has no power over commerce, except such as is thus given to it by the constitution, and the United States courts have, and can have, no jurisdiction over any offenses against commerce, unless it be such as congress is given the power to regulate and control. In re Greene, 52 Fed. Rep. 104.

Interstate and foreign commerce being national in character, it has been

held that the power given to congress to regulate such commerce is exclusive, and implies a prohibition against any restraints upon such commerce. This prohibition has been enforced in many cases where the United States supreme court have held laws of the states unconstitutional and void, on the ground that they amounted to a restraint upon interstate or foreign commerce.

(2) There are no crimes at common law against the United States, and the criminal jurisdiction of the United States courts is limited to crimes created by statutes of the United States. Prior to the passage of the act here under discussion, there was no statutory provision of the United States making contracts, combinations, or conspiracies in restraint of or to monopolize interstate or foreign trade crimes against the United States, so that the United States courts could have no jurisdiction over that subject-matter even if such contracts, combinations, or conspiracies were criminal at common law or under state statutes.

(3) Prior to the passage of this act there was no provision giving to the United States courts even civil jurisdiction over contracts, combinations, or conspiracies upon the sole ground that such contracts, combinations, or conspiracies affected interstate or foreign trade or commerce; and such courts, therefore, had only such jurisdiction over these matters as might vest in them by reason of other circumstances, such as differences in citizenship.

(4) Under the power to regulate commerce among the several states it has been held that congress has the power to regulate the transportation of individuals, of property, and of communications, and also all instruments of such transportation and communication; and that transportation of property begins when the property is delivered to a common carrier for transportation to another state, and does not end until such property has completed its transportation, and has become a part of the general property of the state to which it is sent. And a state may not, even for the purpose of supposed self-protection, interfere with transportation into or through the state beyond what is absolutely necessary for its actual self-protection, and within the scope of its police power. See Henderson v. Mayor, etc., 92 U. S. 259; Railroad Co. v. Husen, 95 U. S. 465, 472. The extent of this grant to the federal government is further seen in the following cases: Gibbons v. Ogden, 9 Wheat. 1; Welton v. State of Missouri, 91 U. S. 275; Walling v. People of Michigan, 116 U. S. 446, 6 Sup. Ct. Rep. 454; Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. Rep. 592; Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. Rep. 681; In re Rahrer, 140 U. S. 545, 11 Sup. Ct. Rep. 865; Trade-Mark Cases, 100 U. S. 96; Philadelphia & Southern S. S. Co. v. Pennsylvania, 122 U. S. 326, 7 Sup. Ct. Rep. 1118.

It seems clear that what would be a regulation of commerce within the implied prohibition of the constitution, if attempted by a state, would be a sufficient object of a conspiracy by individuals to make it "in restraint of trade among the states." Clearly it would be obnoxious to the prohibition of the constitution for a state to pass a law that certain nonresident cash-register companies should not be allowed to sell cash registers in the state. If this would be unconstitutional when done by a state, clearly it would be a restraint of trade among the states when attempted by individuals so as to make a conspiracy to accomplish it a conspiracy in restraint of trade among the states. The conspiracy in the present case was to prevent certain corporations from carrying on the business of manufacturing and selling cash registers; and it is alleged that said corporations were carrying on this business among the several states, so that the prevention would operate necessarily and directly to restrain interstate trade in such cash registers in the same way that the state regulation did in Leisy v. Hardin and Robbins v. Taxing Dist., supra. This, however, is a question to be determined at the trial.

### (B) Evils to be Remedied.

Undoubtedly a prominent evil to be remedied in the minds of the framers of the statute was the concentration of the entire business of the country in certain articles in such a manner as to prevent others from engaging in the same business, and thereby to prevent and stifle competition. As stated in the

title, it aims to "protect trade and commerce from unlawful restraints and monopolies; and the evil of a monopoly lay in the prevention of others, either by prohibition from the sovereign power, or by power of individuals, from exercising the same trade. When, therefore, the statute made it criminal to conspire to monopolize, it did not intend to make it criminal for two or more persons to unite in developing their own business by lawful means, nor for one person to sell out his business to another or to others, provided that the prevention of others from engaging in the same business was not contemplated. It did however, intend to make it criminal to conspire to obtain the sole control of any business by means of preventing others from engaging in that business, and, a fortiori, it is so intended where the means of prevention contemplated were of an unlawful character.

### (C) The Remedy Provided.

I. The most narrow effect that can be suggested for this act is that it makes certain acts which were criminal at common law crimes against the United States when such acts are directed to the restraint or monopolizing of trade or commerce among the several states or with foreign nations, and thereby gives to the United States courts jurisdiction of such crimes.

In this view the statute merely remedies the defect of the want of criminal jurisdiction at common law in the United States courts, which has been already pointed out. It is sufficient for the present case as regards several of the counts in the indictment, if this should be held to be the sole effect of the act. Thus a conspiracy to restrain trade by such unlawful means as are stated in this indictment would clearly be a criminal conspiracy at common law. Crump's Case, 84 Va. 927, 6 S. E. Rep. 620; State v. Donaldson, 32 N. J. Law, 157; State v. Rowley, 12 Conn. 112, 113; State v. Crowley, 41 Wis. 271. It is not necessary that each of the means alleged should be unlawful if taken alone, nor that they should all be proved. Com. v. Meserve, 154 Mass. 64, 27 N. E. Rep. 997.

Among the means set forth in the indictment that are clearly unlawful are the following:

(1) Personal violence and threats of personal violence against the agents of the Lamson Company. See Crump's Case, supra, and cases there cited; U. S. v. Lancaster, supra.

(2) Unlawfully inducing the employes of and purchasers from that company to break their contracts, and maintaining them in actions brought for such breaches. Bowen v. Hall, supra; Lumley v. Gye, supra; Evans v. Walton, 36 Law J. C. P. 307; Smith, Mast. & S. 155. As to maintenance, see Ray, Contract. Lim. 293 et seq., and cases cited.

(3) By bringing and threatening to bring vexatious suits against the purchasers and prospective purchasers of cash registers from the Kruse, Lamson, Boston, and Union Companies. Garret v. Taylor, Cro. Jac. 567; Kelley v. Manufacturing Co., 44 Fed. Rep. 19; National Cash Register Co. v. Boston Cash Indicator & Recorder Co., 41 Fed. Rep. 51.

(4) By falsely and fraudulently representing that the registers manufactured and sold by the Kruse, Lamson, Union, and Boston Companies contained defects that they did not in fact contain. See Mogul Steamship Co. v. Macgregor, Gow & Co., supra.

(5) By frightening such purchasers and prospective purchasers from said companies by means of the acts, threats, and misrepresentations aforesaid. Tarleton v. McGawley, Peake, 270; Crump's Case, supra.

It needs no argument to show that a conspiracy to restrain or to monopolize trade by such means would be criminal at common law.

That the statute must be construed more broadly than this, however, is clear from the fact that contracts and combinations in unlawful restraint of trade were not criminal at common law, and this act is clearly intended to make them criminal.

II. The statute was intended to, and does, go further. It makes certain acts which are the subject of civil actions at common law, when directed to the restraint or monopolizing of trade or commerce between the several states or with foreign nations, crimes against the United States, thereby giving the United States courts jurisdiction over them. This construction again, how-

ever, is not broad enough, since to suit the statute it also would practically eliminate the words "contract" and "combination," since neither a contract nor a combination in restraint of trade is civilly actionable at common law.

III. The act goes still further, and makes contracts and combinations which are illegal in the sense of nonenforceable at common law, crimes against the United States when directed to the restraint or monopolizing of trade or commerce among the several states or with foreign nations.

That all three of these effects were intended appears from the act itself, since in no other way can all the terms of the act be given effect, and may also be shown by a reference to the debates in congress when the bill was pending. In the debates in the senate a number of cases are cited as showing what was meant by "restraint of trade" and "monopoly," all of which were civil, and not criminal, cases, and include the principle of the third proposition above laid down. Among these cases were Richardson v. Buhl, 77 Mich. 632, 43 N. W. Rep. 1102; Craft v. McConoughy, 79 Ill. 346; Handy v. Railroad Co., 31 Fed. Rep. 689; Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. Rep. 658.

### (D) The True Reason of the Act.

It thus appears that the true purpose and effect of the act were to remedy the injurious effects of unlawful restraints and monopolies upon trade and commerce so far as congress had the power so to do; that is to say, so far as they were directed against interstate or foreign commerce, its purpose being correctly stated in the title of the act, namely, "An act to protect trade and commerce from unlawful restraints and monopolies."

### SUFFICIENCY OF THE INDICTMENT.

I. So far as charging a conspiracy is concerned, the language follows the ordinary language used for that purpose, and is sufficient.

II. The general allegation of threats, intimidation, and molestation is sufficient. Reg. v. Rowlands, 17 Q. B. 671; Com. v. Dyer, 128 Mass. 70. When the charge was that the defendants "unlawfully, fraudulently, and deceitfully did conspire, combine, confederate, and agree together to cheat and defraud," it was held sufficient. Rex v. De Berenger, 3 Maule & S. 67; Wood v. State, 47 N. J. Law 461, 1 Atl. Rep. 509; Com. v. Fuller, 132 Mass. 563; Com. v. Andrews, Id. 263; Rex v. Gill, 2 Barn. & Ald. 204; U. S. v. Stevens, 44 Fed. Rep. 132; U. S. v. Gardner, 42 Fed. Rep. 829; Sydserff v. Reg., 11 Q. B. 245; Latham v. Reg., 9 Cox, Crim. Cas. 516.

The gist of the offense is the conspiracy. The unlawful object or means merely give character to the conspiracy itself, and show it to have been unlawful. Rex v. Journeymen Taylors, 8 Mod. 11; State v. Glidden, 55 Conn. 46, 8 Atl. Rep. 890. Hence the offense is complete though nothing be done in execution of the conspiracy. Rex v. Spragg, 2 Burrows, 993; Rex v. Rispal, 3 Burrows, 1321; Collins v. Com., 3 Serg. & R. 220; Com. v. Warren, 6 Mass. 74; The Poulterers' Case, (1611,) 9 Coke, 55, Moore, 813; Rex v. Edwards, (1795,) 2 Strange, 707; Rex v. Eccles, (1783,) 1 Leach, 274; Rex v. Gill, (1818,) 2 Barn. & Ald. 204. Hence, also, it is unnecessary to set out the means when the end itself is unlawful. People v. Barkelow, 37 Mich. 455; Com. v. Eastman, 1 Cush. 190; State v. Stewart, 59 Vt. 273, 9 Atl. Rep. 559; Bish. Dir. & Forms, § 301. In the present case the means are set out, and in some of the counts with the utmost particularity.

The unlawful means set out show—

(1) That the conspiracy alleged was unlawful, and even criminal, at common law.

(2) That the restraint of trade was real and unlawful, since clearly such unlawful acts would not tend to encourage the trade of one party while discouraging that of the other. That they would tend to enable the party committing them to afterwards monopolize the trade by independent acts clearly only aggravates the offense.

(3) That the conspiracy was unlawful, and even criminal, "conspiracy in restraint of trade" at common law.

They thus show that the conspiracy alleged was the conspiracy intended by the statute, even if the narrowest construction be given to the language

of the statute. If there was, as the government contends, an offense at common law known as "conspiracy in restraint of trade," it was clearly exactly the offense set forth in this indictment. If, as contended by the defendants, there was no common-law offense of that name, precisely the same result is arrived at by considering the words of the statute separately, and giving to them their lawful common-law meaning. The defendants' argument that the words "conspiracy in restraint of trade" are to be limited so as to read "conspiracy in restraint of trade by contractual means," is wholly unwarranted by any principle of construction. In this view the word "conspiracy" adds nothing to the word "combination." The rule that every word of a statute is to be given effect, where possible, is too familiar to need a full citation of authorities. U. S. v. Hartwell, 6 Wall. 385,–395, 396; Montclair v. Ramsdell, 107 U. S. 147, 152, 2 Sup. Ct. Rep. 391.

III. The indictment sufficiently alleges that the object of this unlawful conspiracy was in restraint of trade.

It not only alleges this in all the counts, in the language of the statute, but in certain of the counts also alleges broadly that this object was to hinder and prevent certain named corporations from carrying on the business of manufacturing and selling cash registers; and in certain other counts alleges that it was the object of the conspiracy to ruin and destroy the business of said corporations, then being carried on by them; and in other counts that it was the object to hinder and prevent all corporations other than the National Cash Register Company from carrying on said business, and to ruin and destroy the business of such other corporations then being carried on by them. That the successful accomplishment of such objects as these would result in not only restraint of such trade, but also in the monopolizing of it, is clear; and such objects are sufficient to make the conspiracy criminal, even at common law, especially when, as is alleged in this indictment, they are intended to be accomplished by unlawful and criminal means.

IV. The indictment sufficiently charges that the trade or commerce which it was the object of the conspiracy to restrain and monopolize, was "trade or commerce among the several states." This is specifically alleged in the words of the statute in all the counts. In all the counts, also, it is either specifically alleged or necessarily implied that there was in existence at the time of the conspiracy a trade or commerce in cash registers among the several states, that the defendants knew this, and that the object of the conspiracy was to restrain this specific existing trade. Some of the counts go still further, and give the names of the corporations which were engaged in such trade, and charge that the object of the conspiracy was to restrain the trade then carried on by said named corporations in cash registers among the several states. This language is clear, and as definite as the nature of the case will allow.

The statute was intended to cover a conspiracy the object of which was a general restraint or monopolizing of any trade which was of an interstate character. The conspirators would not naturally in such a case specify, even to themselves, the specific interstate transactions which it would be their object to restrain or monopolize, but would formulate the general intention and plan to restrain and monopolize all the trade among the states in a certain given subject-matter; for example, cash registers. The allegations are sufficient to show that the restraint and monopolizing contemplated were unlawful; that is, that they contemplated the prevention and destruction of trade by means which would not involve the corresponding encouragement of the trade of others. It is not material whether it appears on the face of the indictment that the means alleged are naturally calculated to affect interstate trade or not. It is distinctly alleged that it was the intent of the conspiracy to restrain and monopolize interstate trade. The means are only alleged to show the unlawful character of the restraint contemplated, not to show the object of the conspiracy to have been against interstate trade. It is submitted, however, that the means alleged are such as would naturally affect interstate trade when directed, as in this case, against corporations engaged in interstate trade, and that the fact that they would also affect domestic trade is immaterial; and this upon the same principle upon which it is held that a state cannot tax interstate commerce even though at the same time it tax domestic commerce to the same extent. Leisy v. Hardin, 135 U. S. 100, 10 Sup.

Ct. Rep. 681; Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. Rep. 592. The means alleged are such as would necessarily prevent the corporations engaged in said cash-register business from transporting said registers from one state into another, and selling them in the latter state.

All the elements required by the statute are therefore sufficiently alleged.

Elihu Root and John D. Lindsay, (also in support of the indictment,) in the interest of certain private individuals.

### First.

In conspiracy the gist of the offense is the combination; and, when conspiring to do a particular thing is made criminal by statute, a charge of a conspiracy to do that thing is a complete and sufficient description of the offense. Neither the means by which the conspirators intend to do the thing nor overt acts towards the doing of it need to be alleged. Neither means nor overt acts enter into the description of the offense unless expressly made an element of the offense by the statute. If the statutory description of the crime is conspiring to do a thing by unlawful means, then the unlawful means must be set out. If the statutory description is a conspiring to do a thing and an overt act, then the overt act must be set out. In the one case the unlawful means, and in the other the overt acts, are elements of the offense which necessarily enter into its description, and must be averred; otherwise they need not be averred. The rules upon this subject are very fully discussed in Com. v. Barger, 37 Leg. Int. 274, July 2, 1880, by Hare, P. J. See, also, Com. v. Hunt, 4 Metc. (Mass.) 125; Rex v. Gill, 2 Barn. & Ald. 204; 2 Whart. Crim. Pl. (4th Ed.) 625, 628; U. S. v. Donau, 11 Blatchf. 168; Carew v. Rutherford, 106 Mass. 1; Com. v. Dyer, 128 Mass. 70; Reg. v. Rowlands, 17 Adol. & E. (N. S.) 671; U. S. v. Dennee, 3 Woods, 47; U. S. v. Milner, 36 Fed. Rep. 890; U. S. v. Dustin, 2 Bond, 332; Com. v. Eastman, 1 Cush. 190; Com. v. Shedd, 7 Cush. 514.

It is also the rule, as shown by the foregoing authorities, among many that, where the character of the means to be employed is an element of the offense, only a general description of the means bringing it within the statutory requirement is necessary, and not a specific enumeration of particular means, e. g. false pretenses need not be set out.

### Second.

It has been held, however, that this act does not describe the offenses which it denounces with such certainty and precision as to make a description of the offense charged in the bare words of the act sufficient. There must be included in the description of the offense such further averments of fact as to show that the conspiracy charged was, indeed, the conspiracy which congress intended to make criminal. See various decisions upon the indictment in U. S v. Greenhut, in the northern district of Ohio, (51 Fed. Rep. 205;) in the southern district of New York, (Id. 213;) in the southern district of Ohio, In re Greene, (52 Fed. Rep. 104.)

This necessity of further averment, in addition to the words of the statute, arises from the fact that congress used in the statute terms which, taken in their most general sense, would include acts of the most innocent character, so conformable to the general principles of law that congress could not have intended to declare them criminal. Thus there is a great variety of contracts which are essential to the legitimate conduct of business, and which are uniformly enforced by our courts, both of law and of equity, and yet which are to some extent in restraint of trade. It is not to be supposed that congress intended to make them criminal. Thus, also, the essential element of private property is monopoly. Our whole system of law relating to property is designed to maintain and protect that monopoly. Congress, of course, did not intend to make it criminal.

In describing offenses under this statute it is, therefore, necessary to include such averments as will show that the restraint of trade, or the monopoly which is the object of the conspiracy, is the kind of restraint or the kind of monopoly which congress intended to denounce. To thus make apparent

the character of the object of the conspiracy and bring it within the class of objects which congress intended to make criminal is the sole function of all averments in the indictment in addition to the charge in the words of the statute; and, if the object thus described is the object which congress intended to include within the words used in the statute, the indictment is sufficient.

### Third.

The fundamental question upon the first set of counts is whether the destruction of a competitor's trade in the manner described is a restraint of trade within the intent of the provision of the first section of the act which makes a conspiracy in restraint of trade criminal.

I. To ascertain what constitutes a contract, combination, or conspiracy in restraint of trade, recourse must be had to the common law for the proper definition of these general terms, and to ascertain whether the acts charged come within the statute. In re Greene, 52 Fed. Rep. 104.

II. The statute enumerates three distinct facts, viz.: (a) Contracts in restraint of trade; (b) combinations in the form of trusts or otherwise in restraint of trade; (c) conspiracies in restraint of trade.

Each one of these points to a separate and distinct class of cases in which, prior to the passage of the act, the courts of England and America had condemned acts injurious to the public interest, because of their effect upon trade. In all three the principle of decision and the ground of condemnation had been that they interfered with the public's right to have trade and competition in trade free and unrestricted.

(1) The first class of acts included the ordinary contracts which were declared to be void as against public policy, because some of the contracting parties thereby prevented themselves from pursuing their occupations, and the public was thus deprived of their contribution to the competition therein.

Judge Bradley states the rule regarding these cases in Navigation Co. v. Winsor, 20 Wall. 64, in these words:.

"There are two principal grounds on which the doctrine is founded that a contract in restraint of trade is void as against public policy: One is the injury to the public by being deprived of the restricted party's industry; the other is the injury to the party himself by being precluded from pursuing his occupation, and thus being prevented from supporting himself and his family. It is evident that both these evils occur when the contract is general, not to pursue one's trade at all, or not to pursue it in the entire realm or country. The country suffers the loss in both cases, and the party is deprived of his occupation, or is obliged to expatriate himself in order to follow it. A contract that is open to such grave objections is clearly against public policy."

(2) The second division of the statute, viz. combinations in the form of trusts or otherwise in restraint of trade, points to a class of cases which, while it may include the first class, includes also a great number of combinations distinguished from ordinary contracts in restraint of trade by a broad line of demarcation. These are combinations in which there is no contract, which either by its express terms or by implication binds the contracting party not to exercise his trade, or not to compete freely with others, but which are declared by the courts in violation of public policy, because they accomplish the effect of preventing freedom of trade and competition. As a rule the agreements and arrangements by which these combinations are formed are themselves, in their terms and requirements, of the most harmless and innocent character. It is the effect, and the effect alone, upon the public interest which causes them to be declared against public policy. The following are illustrations of this class: Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434; Arnot v. Coal Co., 68 N. Y. 558; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Chancey v. Manufacturing Co., 62 Barb. 395; People v. North River Sugar Refinery Co., 54 Hun, 354, 7 N. Y. Supp. 406; People v. North River Sugar Refinery Co., 121 N. Y. 582, 24 N. E. Rep. 834; Hilton v. Eckersley, 6 El. & Bl. 47; Craft v. McConoughy, 79 Ill. 346; Salt Co. v. Guthrie, 35 Ohio St. 666; Richardson v. Buhl, 77 Mich. 632, 43 N. W. Rep. 1102; U. S. v. Jellico Mountain Coal & Coke Co., 46 Fed. Rep. 432; Biscuit & Manuf'g Co. v. Klotz, 44 Fed. Rep. 721; Hoff-

man v. Brooks, 11 Wkly. Law Bul. 258; State v. Standard Oil Co., (Ohio Sup.) 30 N. E. Rep. 279.

So long as the arrangements or agreements in regard to trade made by a combination produce the injurious effect, no form of contract or devise to produce that effect indirectly avails to escape the consequences.

(3) The third division of section 1—"conspiracies in restraint of trade"— refers us to a class of cases in which the effect upon trade is produced, not by contract obligations binding the parties not to compete, not by pooling arrangements which make it against the party's interests not to compete, but by preventing others from carrying on trade.

An essential element in these cases is that the prevention shall be, not by means of competition itself in the ordinary course of business,—one competitor driving out another by fair competition,—but that the prevention shall be by unfair means, which are themselves private injuries to the person whose trade is interfered with. Conspiracies to destroy or injure another's business by such means have always been actionable because of the private injury, and indictable because of the public injury, upon the same grounds and for the same reasons which have led the courts to declare contracts and combinations accomplishing the same effect void as against public policy. The law upon the subject is very fully presented in Mogul Steamship Co. v. McGregor, Gow & Co., 23 Q. B. Div. 598, 605, (1892,) App. Cas. 25.

Conspiracies among laborers to boycott, to coerce their employers, to prevent other laborers from working, are familiar illustrations of this principle. See Rex v. Eccles, 1 Leach, 274; Rex v. Bykerdike, 1 Moody & R. 179; Reg. v. Hewitt, 5 Cox, Crim. Cas. 162; Reg. v. Duffield, Id. 404; Reg. v. Druitt, 10 Cox, Crim. Cas. 592; Reg. v. Rowlands, 5 Cox, Crim. Cas. 436; People v. Fisher, 14 Wend. 11; People v. Melvin, 2 Wheeler, Crim. Cas. 262; Master Stevedores' Ass'n v. Walsh, 2 Daly, 1; People v. Wilzig, 4 N. Y. Crim. R. 403; State v. Stewart, 59 Vt. 273, 9 Atl. Rep. 559; Crump's Case, 84 Va. 927, 6 S. E. Rep. 620; State v. Donaldson, 32 N. J. Law, 157; State v. Glidden, 55 Conn. 76, 8 Atl. Rep. 890; People v. Walsh, 15 N. Y. St. Rep. 17; Steph. Dig. Crim. Law, 390; People v. Everest, 51 Hun, 19, 3 N. Y. Supp. 612.

(4) It appears from the foregoing review that at the time the act now under consideration was passed restraint of trade, as known to the law, was preventing any one from freely exercising his trade. That this prevention was held to be against public policy, because it deprived the public of the benefit of the prevented industry and of its competition with others; that all contracts which had that effect were held to be void, because they produced that public injury; that all combinations which had that effect, directly or indirectly, were held to be unlawful, because they produced that injury; that all conspiracies to produce that effect upon others by threats, intimidation, fraud, and other similar means were held to be criminal, because they produced that same public injury.

Clearly these were the conspiracies intended and aptly described in the language of the first section of the statute.

(5) The means described in general terms in the first count of the indictment, and particularly enumerated in the fourth and fifth counts, are the very means which have always been held to make interference with business unlawful, and to make a conspiracy to interfere with business through other instrumentality a criminal conspiracy. Mogul Steamship Co. v. McGregor, Gow & Co., supra.

(6) The prevention of competition by unlawful interference with the business of competitors was one of the ways of producing this kind of public injury, which was at the time this act was passed well known through judicial decisions, and it was present in the mind of congress when it passed the act. See 21 Cong. Rec. pt. 3, pp. 2456–2458, 2598. It is part of the judicial history of the country that, prior to the passage of the act, several of the directors of the Standard Oil Company had been convicted in the state of New York of a conspiracy to drive one of its competitors out of business by violent and dangerous methods, the conspirators going so far as to attempt the destruction of the competitor's property. See People v. Everest, 51

Hun, 19, 3 N. Y. Supp. 612. The indictment in that case was for a conspiracy (under section 168 of the New York Penal Code) to commit an act injurious to trade.

It will be observed from the foregoing extracts and the cases therein referred to that congress had in mind as one of the evils at which this act was aimed the suppression of competition as well by means operating upon other persons than the guilty combiners as by the direct means of the agreement entered into between those combiners.

(7) Counsel for the defendants has referred to many state statutes which he says were designed to apply only to offenses by way of contract operating only upon the persons combining. He omits to observe that in all these states combination to produce the same effect by unlawful means operating upon others were already criminal at common law, and by already existing statutes; e. g. the statute of New York, making it a criminal "conspiracy to do any act injurious to trade or commerce." It was, therefore, unnecessary for the states which had existing statutes of this description, and which had a common law, to include in their acts designed for the protection of free competition in provisions affecting such conspiracies as are shown in the present indictments.

But when congress undertook to assert over interstate commerce the same protection which the common law and the statutes of the several states gave to commerce within their respective limits, there is no warrant whatever for saying that congress did not mean to cover the entire field as broadly as the whole body of common law, and legislation in the respective states covered it within their respective limits. The word "conspiracy" is appropriately added to the words "contract" and "combination in form of trust or otherwise," to accomplish this complete design.

(8) The idea that there is any distinction in substance between what counsel for the defendant calls "contractual restraint of trade" and the restraint charged in this indictment is wholly illusory, for conspiracy is a contract just as much as any illegal combination. The only element of contract in either is the agreement of the parties to accomplish a given result. That agreement may or may not include specifically the means by which they intend to accomplish it. This element of agreement is, indeed, common to all the offenses denounced in the first section of the act. It is to be found in the contracts, in the combinations, and in the conspiracies there described. It is, however, the only contractual element which is essential to any of the offenses described in that section, and this same contractual element must necessarily be shown in every case of criminal conspiracy. All the authorities which had declared the law of trusts and trust combinations at the time the act was passed agreed that in declaring that the illegal object to accomplish which the minds of the parties met together, made their agreement illegal, wholly irrespective of its form, or of the means by which they intended to accomplish the object. It seems quite absurd to contend that when congress struck at an evil which the courts had declared rendered every combination which produced it illegal, entirely irrespective of its form or avowed purpose, congress nevertheless meant to except combinations which produced that same evil by means already recognized as unlawful. The court is asked by the defendants to deprive an express substantive provision of the statute of all meaning whatever, to say that it adds nothing to the other provisions of the statute, for the purpose of inferring that congress meant to make it criminal to produce the given result of preventing competition by means otherwise lawful, and not to make it criminal to produce the same result by means otherwise unlawful.

#### Fourth.

The fundamental question upon the second set of counts is whether a monopoly acquired by destroying the trade of competitors in the manner described is a monopoly within the intent of the provision of the second section of the act, which makes a conspiracy to monopolize criminal.

In the debate upon this act in the senate, Mr. Edmunds quoted from Webster's Dictionary the following definition of the verb "to monopolize:" "To engross or obtain by any means the exclusive right of, especially the right of trading to any place or with any country or district; as to monopolize the

India or Levant trade." 2 Pike, Hist. Crime, p. 102. And see St. 23, James I. cc. 331-333; 4 St. at Large, p. 734; The Case of Monopolies, 11 Coke, 85a.

The words of the statute are broad enough to include all appropriation of trade to the exclusion of others. It is equally manifest, however, that from the application of those words must be excluded all appropriation of trade to the exclusion of others which is done under warrant of law, such as the obtaining of a monopoly by letters patent, the obtaining of a monopoly by the ordinary purchase of property, the obtaining of a monopoly by the ordinary process of fair competition and trade as the result of superior intelligence, industry, or activity. Starting with the original well-understood and commonly received meaning of the word, and applying this process of exclusion, we find that there remains a class of monopolies with which the courts have of recent years become very familiar, which are created wholly without warrant of law, which have all the characteristics and all the injurious effects of the famous monopolies of Queen Elizabeth's time, and which are accomplished by a more or less direct violation of the rules above considered against restraint of trade. The judicial condemnation of such monopolies is an extension of the principles relating to restraint of trade. The monopoly is treated as the extreme evil resulting from restraint of trade upon a large scale.

This view of monopolies is illustrated and fully shown in the cases relating to combinations cited under the third head of this brief. Whatever else may or may not be included within the term "to monopolize," as used in the statute, it is safe to say that it does include the accomplishment of the effects above described by any acts which constitute an unlawful restraint or prevention of trade.

### Fifth.

The counsel for the defendants says that, unless the construction for which he contends is put upon the act, its range is almost unlimited; and he goes so far as to assert that, under the theory upon which this indictment is drawn, a very large proportion of all the serious crimes within the states could be brought within the federal jurisdiction. His argument for this assertion rests upon certain propositions of law relating to criminal responsibility for crimes resulting unintentionally from unlawful confederacies.

A conspirator is held equally guilty with his confederate for a murder (or other higher offense than the one contemplated) committed by the latter in the perpetration of a preconcerted offense by both only when the higher offense is the natural result of the crime intended, or is committed as a means of successfully effecting the intended purpose. So, where one of the conspirators deviates from the original plan, or undertakes to do something out of the range of the purpose contemplated, the other is not criminally responsible for this result. Our only purpose in referring to these propositions is to express our dissent from the view taken by the counsel for the defendants,—that, upon our construction, the commission of any act, however remotely affecting or interfering with interstate commerce, would render the perpetrator of such act liable to prosecution under the act of congress, no matter whether the interference was intentional or otherwise. It is not necessary to discuss this point.

We allege a conspiracy to do certain things which we contend do restrain trade. The question of whether the acts committed by the conspirators are intentional or not is one for the trial. If the acts the government proposes to prove as evidence of the conspiracy were unintentionally done, or were committed without any design of accomplishing a result that, in contemplation of law, would constitute a restraint of trade or monopoly, within the meaning of the act, proof to that effect would be proper matter of defense.

In answer to the remaining portion of defendants' argument on this head, it is only necessary to say that the jurisdiction of the federal courts is not necessarily exclusive. An act may be a violation both of the laws of the United States and of the state where it is committed; and it does not affect the question of federal jurisdiction that the defendants intended to use means themselves the subject of prosecution under the state laws.

### Sixth.

It is necessary that the restraint of trade charged should be a restraint of trade among the several states.

Upon that point it seems sufficient to say that it is so charged. There is no doubt, uncertainty, or question in the language of the statute which describes that element of the offense. "Trade among the several states" has been described and defined by the supreme court of the United States in numerous cases. Gloucester Ferry Co. v. State of Pennsylvania, 114 U. S. 203, 5 Sup. Ct. Rep. 826; Lyng v. Michigan, 135 U. S. 161, 10 Sup. Ct. Rep. 725; Ficklen v. Taxing Dist., 145 U. S. 1, 12 Sup. Ct. Rep. 810. The language of the statute obviously and clearly applies to all trade coming within that description. There is not one kind of trade among the several states to which the statute was intended to apply, and another kind to which it was not intended to apply. As there is no uncertainty or indefiniteness in regard to this element of the offense, the charge, which states this element of the offense in the words of the statute, is sufficient.

In some of the counts, however, the indictment does go beyond the necessities of pleading, and charges not only that the conspiracy was in restraint of trade and commerce among the several states, but that it was to destroy that trade, and that it was to destroy that trade by practices which, under the principles above stated, would constitute the destruction,—the very kind of restraint of trade which congress had in mind.

There can be no question under this statute whether the means which the conspirators had in mind were adequate or appropriate to accomplish the destruction of trade among the states. As we have seen, the means are not an essential element of the offense. They have no relevancy to the charge, except as they may serve to characterize the nature of the restraint proposed by the conspirators, and show that it is the kind of restraint which congress had in mind. So long as the restraint was of the kind which congress had in mind, then it is immaterial whether it was in fact possible that interstate trade could be destroyed by it. The offense of conspiring to destroy interstate trade by that particular kind of restraint was committed when the agreement of the conspirators took place, whether they ever have or ever can or could accomplish their object.

Each of the three elements of the offense is clearly and definitely charged. First, the conspiracy; second, the restraint, which is shown to be the kind of restraint which congress had in mind; and, third, the thing to be restrained, which is charged to be the thing which the act clearly and definitely described. 2 Bish. Cr. Crimes, (8th Ed.) § 202.

*G. W. Chaplin,* for defendants.

### COMMERCE AMONG THE SEVERAL STATES.

This act must rest on the constitutional power to regulate commerce with foreign nations and among the several states, and those sections which are pertinent to the present controversy must rest upon the power to regulate commerce among the states. The matter with which we are dealing is "commerce among the several states." It is important, at the outset, to consider, in a general way, the conventional meaning of that phrase in federal jurisprudence, the outline of the field, as fixed by federal decisions, and the way in which, and the extent to which, the federal government can deal with it.

The meaning of the phrase, "commerce among the several states," in the federal constitution, is a meaning quite different from the meaning of those words as mere English words. The word "commerce." It is not necessary here particularly to discuss. It includes intercourse of many, if not all, lawful kinds, and is broader than the word "trade." The constitutional phrase, however, "commerce among the several states," has a highly artificial, conventional, and refined meaning, fixed by principles of public policy and statesmanship, and in view of the complex character of our government, and the relative rights and duties of the states and the general government.

Lewis. Federal Power Over Commerce, p. 10; Paul v. Virginia, 8 Wall. 168, 182; Mobile v. Kimball, 102 U. S. 691, 702; Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. Rep. 475; Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. Rep. 681; Gibbons v. Ogden, 9 Wheat. 1, 4; Kirkland v. Hotchkiss, 100 U. S. 491; Slaughterhouse Cases, 16 Wall. 36, 75, 79; License Tax Cases, 5 Wall.

462; Mugler v. State of Kansas, 123 U. S. 623, 8 Sup. Ct. Rep. 273; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. Rep. 6.

Moreover, it is true of most, if not all, of the grants of power in the federal constitution, that the definition of them is not only arbitrary, and fixed by principles of public policy, but that it is not fixed even by any generic distinction, even an arbitrary one, but is fixed merely by degree of proximity or remoteness to state and federal rights. U. S. v. Dewitt, 9 Wall. 41; U. S. v. Fox, 94 U. S. 315; Trade-Mark Cases, 100 U. S. 82; Ficklen v. Taxing Dist., 145 U. S. 1, 12 Sup. Ct. Rep. 810; Maine v. Grand Trunk Ry. Co., 142 U. S. 217, 12 Sup. Ct. Rep. 121, 163; Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. Rep. 876; Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. Rep. 475; U. S. v. Hall, 98 U. S. 343.

Every citizen of our states has a dual political status. In one aspect, he is a citizen of the United States. In another aspect, he is a citizen of his state. It does not follow from the fact that he is a citizen of the United States that congress can protect him against all forms of fraud or violence or other wrong; nor, from the fact that he is a citizen of the state, that the state can so protect him. Congress can protect him only in that range and field of his life and affairs in which he presents himself as a citizen of the United States, and not as a citizen of his state. His state can protect him only in that range and field of his life and affairs in which he presents himself as a citizen of the state, and not of the United States. The line between his federal and his state citizenship is an arbitrary line, and often a hazy and indefinite line, and it is always a line of degree of proximity or remoteness. Nevertheless, it is a constitutional line, which neither the federal government nor the state can cross. U. S. v. Reese, 92 U. S. 214; U. S. v. Harris, 106 U. S. 629, 1 Sup. Ct. Rep. 601; U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Fox, 94 U. S. 315; Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. Rep. 617.

### CONTRACTUAL CHARACTER OF THE STATUTE.

Trade statutes have at different times been passed in various jurisdictions. Some of them have been aimed at labor, some at capital, but the distinction between legislation against labor and legislation against capital has always been patent upon the face of the statutes. The ancient legislation against monopolizing and engrossing was legislation against capital.

The act of July 2, 1890, is directed at capital. It aims at dangers very generally supposed to have lately arisen out of enormous aggregations of capital. It aims at results effected, or to be effected, by combinations of capitalists and aggregations of capital. The evil aimed at in legislation against capital is evil of a contractual character, not an evil of mere fraud or violence. There was no general call for federal protection against an evil of the latter character. The act of 1890 was aimed at a growing tendency to combination by voluntary contract, in derogation of public right and public safety. It was at this, only, that the legislation was aimed; and it is this, only, which its words are to be construed to cover. Attacks upon commerce by mere fraud and violence, it is thus far left to the states to punish. This statute is not a Ku-Klux act. The "restraint" and the "monopolizing" of the statute are contractual restraint and monopolizing,—not mere interference with commerce, as by robbery, assault, champerty, bringing of suits, or other forms of violence, fraud or vexation.

The indictment proceeds upon the theory that the restraint and monopolizing of the statute, at least in the penal aspect of the act, are substantially equivalent to interference with trade, or at least to interference with the trade of rivals. Some of the counts allege conspiracy to interfere with or injure or ruin the business of persons apparently intended to be described as rivals, by mere fraud, violence, or other noncontractual means. The other counts do not specify the means. They therefore fail to allege contractual means. The pleader has completely missed the true scope and effect of the statute.

### CONTRACT CRIMES.

The defendants' counsel think it proper to discuss, at the outset, the place which contract occupies in the criminal law, and to consider the characteristics of those crimes which may aptly be designated as contract crimes.

A familiar instance of crimes of contract is the unlawful selling of intoxicating liquors. To make the offense, an actual contract of sale must have been made, and the questions where, when, and whether an alleged contract of sale was in fact made are determined, not by any rules of criminal law, but by the ordinary principles of the law of contracts. The questions of locus contractus, of principal and agent, of delivery, for example, are discussed and settled in liquor prosecutions precisely as in civil actions. Com. v. Eggleston, 128 Mass. 408; Com. v. Burgett, 136 Mass. 450.

A cash sale of liquors to a minor is not, under an ordinary selling statute, a "sale" to him, if in fact, although without the vendor's knowledge, he is buying for an adult. Com. v. Lattinville, 120 Mass. 385; Com. v. Finnegan, 124 Mass. 324; St. Goddard v. Burnham, Id. 578.

The element of true contract, in contract crimes, is well illustrated by cases upon English statutes aimed at the "putting off" of counterfeit money to a confederate. The offense of "putting off" is distinguished from the crime of uttering, in that an uttering, to be criminal, must be made to an innocent person, and does not necessarily imply a contract, while a "putting off" of forged paper implies a true contract of sale, gift, or barter, to be established like any other sale, gift or barter. In Rex v. Joyce, (MS., O. B.,) Car. Supp. 184, the indictment (framed on St. 8 & 9, Wm. III. c. 26, § 6, for "putting off" counterfeit money) charged that five counterfeit shillings were paid and put off for two shillings. The proof was that five bad shillings were sold for half a crown. "Thompson, C. B., and Heath, J., held that, as this was a contract, it must be correctly proved as laid, and directed an acquittal." See, also, Rex v. Hedges, 3 Car. & P. 410; Rex v. Wooldridge, 1 Leach, 307; 1 East P. C. 180.

The crime of "obtaining goods by false pretenses" is a crime of true contract. If I secure goods by false statements, my crime will be "false pretenses" or larceny, according as I do or do not effect a meeting of minds, which actually passes title. If, on the one hand, I represent to a vendor that I am rich, and thereby induce him to sell me goods upon credit, there is a true contract of sale between us,—voidable, indeed, at the vendor's option, for the fraud, but none the less a true contract until avoided,—and my offense is "obtaining goods by false pretenses." If, on the other hand, I get goods by representing that I am A.'s servant, and that A. has commissioned me to buy the goods for him, and get them as upon a sale upon credit to A., there is no meeting of minds between the vendor and A. There is no meeting of minds between the vendor and me, to the effect that I am to be the purchaser on credit. There is therefore no meeting of minds at all in true contract, and the offense is larceny. It is immaterial, in such case, that the supposed vendor intends to pass title, or thinks that he is passing title. The question is, not what he or the supposed purchaser intends or thinks, but is there, or is there not, a meeting of minds in contract? No contract, no crime. No reported cases pursue into greater refinement the question of contract or no contract than false pretense and larceny cases, close on the dividing line.

## THIS STATUTE A STATUTE OF CONTRACT CRIME.

The act of 1890 is a statute of contract crime. Neither in its restraint nor in its "monopolize" provisions does it aim to punish anything else than (a) the making of contracts; or (b) the combining, conspiring, or attempting to make or to effect the making of contracts; or, possibly, (c) the combining or conspiring or attempting to support or enforce contracts. It is essential to guilt under it that a contract be made, or that contract results be the aim.

This is, in substance, the view which has been taken of the act in the judicial decisions which have thus far been made upon it, and is the logical result of the reasoning on which they are rested. If this were a small matter, the defendants' counsel would be quite well content to rest their argument upon those decisions. Since, however, no one of those cases is a decision of a court of last resort, or is a binding precedent upon this court, or is on all fours with the case at bar, the defendants' counsel, particularly in view of the importance of the present case, will proceed to consider various lines of

reasoning and authority which seem to them, independently of those cases, to require an exclusively contractual reading of the statute. The decided cases upon the statute will also be referred to at proper points in the discussion.

## TECHNICAL TERMS IN THE STATUTE.

The use of technical words and phrases in the statute is such as necessitates the contractual construction. It is a familiar principle of statutory construction that, where a new statute uses words or phrases already having a settled technical signification in the law, these words or phrases in the statute are to be taken in such technical sense, unless the context makes such a reading impossible.    E. g.

"Law of nations."   U. S. v. Smith, 5 Wheat. 153.

"Utters."   U. S. v. Carll, 105 U. S. 611.

"Embezzles."    U. S. v. Britton, 107 U. S. 655, 669, 2 Sup. Ct. Rep. 512.

"Steal, take, and carry away."   Id.

"Murder."   Ball v. U. S., 140 U. S. 118, 11 Sup. Ct. Rep. 761.

"Negotiable;" "indorsement and delivery."   Shaw v. Railroad Co., 101 U. S. 557.

This principle is but an application of a broader principle, which finds expression, also, in the rule that statutes are to be presumed to depart as little as possible from the common law.   Shaw v. Railroad Co., 101 U. S. 557; Brown v. Barry, 3 Dall. 365.

A similar conservative principle is found in the rule that statutory expressions borrowed from the statutes of another jurisdiction are to be taken in the meaning of their original domicile, as defined there by judicial construction.   Railroad Co. v. Moore, 121 U. S. 558, 7 Sup. Ct. Rep. 1334. This latter rule has just been applied to the interstate commerce act. Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 282, 284, 12 Sup. Ct. Rep. 844.

Such legislation is extremely common with congress, and is, indeed, a distinguishing peculiarity of its legislation. The greater part of what may be called federal "lawmaking" legislation consists in the adoption, from time to time, and upon different subjects, by a mere summary reference, and often by terse and elliptic designation, of a complete title or head of the common law, civil or criminal, or of some other body of jurisprudence. The chief part of the federal criminal law exists only in this way. See cases cited above, and Moore v. U. S., 91 U. S. 270, 273, 274; Smith v. Alabama, 124 U. S. 465, at page 478, 8 Sup. Ct. Rep. 564, at page 569.

It is a feature of the operation of this principle that the summary adoption by a federal statute of a particular head or title of law, civil or criminal, brings in that head of law, with all its details and all its exceptions, and that the statute has in law precisely the same reading which it would have, should it, as would a detailed Code, rehearse at length, and minutely, all those details and exceptions. In U. S. v. Carll, cited above, a statute punishing, in terms, the "uttering" of forged federal paper, "with intent to defraud," was held to incorporate into the federal jurisprudence the common law of uttering, with all its limitations, and to require, therefore, as an element of the crime, (although not expressed in the statute,) knowledge that the paper was forged.

It is an equally well-settled principle that where a word has a well-known, settled, and technical (though recent) meaning,—not in the law, but in the language of a trade, or in common speech,—the word, in a new statute, will be given that meaning.   Arthur v. Lahey, 96 U. S. 112; Arthur v. Morrison, Id. 108; Greenleaf v. Goodrich, 101 U. S. 278.

## EFFECT OF WORD "TRADE" IN THIS STATUTE.

The word "trade" would seem, in its meaning as an individual word, to be a narrower word than "commerce." (Marshall, C. J., Gibbons v. Ogden. 9 Wheat. 1, 189; Miller, Const. c. 9,) and therefore to be embraced within the meaning of the word "commerce." Even if it were a broader word than "commerce," it could not operate more broadly than "commerce" in this statute, for the constitutional power of congress stops with "commerce.'

The word "trade," therefore, in this statute, is either synonymous with "commerce," or narrower than it, and in either view it is, as a mere individual word, surplusage in the statute. The word "trade" must, however, be given effect, if possible. Platt v. Railroad Co., 99 U. S. 48; Market Co. v. Hoffman, 101 U. S. 112.

It will be unnecessary here to discuss the question how far the "restraint of trade" of the common law is enlarged in its field of operation by its application in this statute to "commerce," in so far as "commerce" may be broader than "trade;" for, if anything in this indictment comes under the head of "commerce," it also comes under the head of "trade." Nothing set forth in this indictment lies in those outlying zones, if any, of commerce, which extend beyond the confines of trade.

## TECHNICAL MEANING OF "RESTRAINT OF TRADE."

The phrase "restraint of trade," therefore, upon the principles discussed above, operates to evoke from the common law, and to introduce into the federal jurisprudence, a complete head or title of the common law. We come, then, to the question of what is meant in the common law by "restraint of trade."

This phrase, like many others, has at the common law two technical meanings,—a broader and a narrower. The broader is generic, and includes all technical "restraint of trade." The narrower is specific, and includes only unlawful "restraint of trade." The broader conveys no obnoxious suggestion. The narrower is of obnoxious signification. In both its senses the phrase means contractual restraint, and only contractual restraint,—restraint by contract, and only by contract. Both the broader and the narrower meaning are well set forth by Greenh. Pub. Pol. 683.

The phrase, "in restraint of trade," is almost always used in the common law in connection with the word "contract," or, less frequently, "combination." In its less common connection with the word "combination," the phrase merely indicates the joinder of a considerable number of persons in a contract; limiting one or more, but usually all of them. When, as often happens, the parties to a considerable combination in "restraint of trade" do not trust each other, and do not wish to have the burden of suing each other to enforce the contract, they often put their trade assets and plants into the hands of a stakeholder, who is to carry out the restraining contract, either according to a detailed scheme, or according to his discretion, and so make the operation of the restraint, as it were, automatic. The stakeholder, in such case, becomes, by operation of law, a trustee. The result of the proceeding is, within the meaning of the law word, a "trust;" and to this peculiar form of trust the common speech now applies, in an exceptional sense, and with a hostile signification, the word "trust." As to combinations in restraint of trade, see Id. 442-459.

## CONSPIRACY IN RESTRAINT OF TRADE IN THE CRIMINAL LAW.

It remains to be considered whether the phrase "in restraint of trade," either alone or in connection with the word "conspiracy," or any other word, had in the criminal law a technical meaning broader than, or different from, its technical meaning in the civil law.

Such separate technical meaning in the criminal law, to be effectual here, would have to be a meaning generally recognized, and not merely a matter of personal or occasional nomenclature. If such a meaning existed in the criminal law, it would appear in the approved text-books,—old and new. In the following text-books the words and phrases, "restraint of trade," and "conspiracy in restraint of trade," do not appear (unless in some editions which the defendants' counsel have not seen) in the index, nor does the title "Conspiracy," although it covers conspiracies dealing with trade, allude to "restraint of trade." No one of these books, it is believed, uses the phrase, "conspiracy in restraint of trade:" 4 Bl. Comm.; Hawk. P. C.; Archb. Crim. Pr. & Pl.; Chit. Crim. Law; Rob. Crim. St.; Woolr. Crim. Law; Paley, Conv.; Carr. Crim. Law; Bish. Crim. Law; Bish. Crim. Proc.; Whart. Crim. Law; Whart. Crim. Pl.; Russ. Crimes; Davis, Crim. Law; Maugh. Law; Lewis,

Crim. Code; Washb. Crim. Law; May, Crim. Law; Lewis, U. S. Crim. Law; Lipp. Crim. Law; Heard, Crim. Law; Gabb. Crim. Law; Fish. Crim. Dig.; Pike, Hist. Crime.

The only instances of the use of the phrase, "conspiracy in restraint of trade," or "restraint of trade," in criminal law books, as far as the defendants' counsel can learn, are in the seventh edition of Roscoe's Criminal Evidence, in Steph. Dig. Crim. Law, (1877,) and Erle, Trade Un. The chapter in Roscoe on "Conspiracies in Restraint of Trade" was prepared by Sir James Fitzjames Stephen, as he tells us in his "Digest of the Criminal Law," (1877, note 18, p. 383.) Sir James Stephen had then been engaged for more than 10 years in the study of the criminal law from a scientific point of view, and chiefly with reference to legislation. Steph. Hist. Crim. Law, (1883,) preface. What he wrote in Roscoe was subsequently elaborated by him in his "History of the Criminal Law," without material change. The nomenclature, "Conspiracies in Restraint of Trade," in Roscoe, is therefore a personal nomenclature of a broad and scientific student of criminal law, looking more to the future than to the present or the past, and of such public and scholarly position as to be entitled, if he so desired, to make a slight change of nomenclature. The propriety, however, of his change of nomenclature, if there was such, does not make his phrase a technical nomenclature of the common law.

In his "Digest of the Criminal Law," (1877,) all that he says in the text upon this head is included in articles 390–392, and note 18. But what he there says begs the question how far violence is to be considered in the matter of "restraint of trade."

Erle on the Law Relating to Trade Unions is not a text book at all. It does not profess to be written peculiarly for lawyers, and is perfectly at liberty to use popular nomenclature. Moreover, it is a book written in support of a theory as to freedom of trade at the common law,—a theory which, as Mr. Justice Stephen shows, is erroneous.

An examination of the English Statutes relating to offenses against trade fails, with the exception of one preamble, to detect the use, in a criminal sense, of the phrase, "in restraint of trade."

(1720,) 7 Geo. I. St. 1, c. 13; (1725,) 12 Geo. I. c. 34; (1749,) 22 Geo. II. c. 27; (1772,) 12 Geo. III. c. 71; (1777,) 17 Geo. III. c. 55; (1795,) 36 Geo. III. c. 111; (1800,) 39 & 40 Geo. III. c. 106, repealing 39 Geo. III. c. 81; (1824,) 5 Geo. IV. c. 95; (1825,) 6 Geo. IV. c. 129; (1844,) 7 & 8 Vict. c. 24.

Preamble: "Whereas, it is expedient that such statutes, [forestalling and regrating,] and other statutes made in hindrance and in restraint of trade, be repealed." (1859,) 22 Vict. c. 34; (1875,) 38 & 39 Vict. c. 86. Here "restraint" is plainly contractual.

## TECHNICAL MEANING OF "MONOPOLIZE."

The word "monopolize," and its noun, "monopoly," have in the law, and had at the time of the passage of the act, a technical meaning. In so far as they implied any exclusive privilege not resting upon a government franchise, or upon individual ownership of property, they involve the idea of contract. 4 Bl. Comm. 159; Ray, Contract. Lim. 210–245; Greenh. Pub. Pol. 670 et seq; Ricks, J., In re Corning, 51 Fed. Rep. 205.

It is not, in the legal sense, "monopolizing," to raise upon one's own ground all the corn or wheat for the subsistence of a community. Like the terms, "restraint of trade," and "contract in restraint of trade," "monopoly" has, in the common law, a broader and favorable sense, including just and rightful monopolies, such as patents or copyrights, and a narrower and obnoxious sense, embracing only monopolies counter to law or public policy. "Monopoly" is limited, in its broader or favorable sense, to public franchise, private ownership, or contract. In its narrower and obnoxious sense, it is limited to unlawful contractual means. It is not monopolizing for a band of desperadoes to invade an isolated community, and rob it of its winter's store. He only monopolizes, in the invidious legal sense of the word, who with wrongful intent buys up, or attempts to buy up, the whole, or substantially the whole, of a given commodity in a given locality, or at least contracts, or attempts to contract, for the control of it. Cases cited above. Section 2 of the statute, therefore, undertakes to punish nothing but the making of a particular form

of contract,—usually a contract of purchase,—and conspiracies, and attempts to make, or to promote the making of, or perhaps to enforce, such contracts. This effect of these technical words in the statute has been repeatedly recognized. U. S. v. Greenhut, 50 Fed. Rep. 469; In re Corning, cited above; U. S. v. Greenhut, 51 Fed. Rep. 205; In re Greene, 52 Fed. Rep. 104; In re Terrell, (U. S. v. Greenhut,) 51 Fed. Rep. 213.

The mere fact that England and the several states have varied in details, or upon the shades of meaning and the precise scope of technical expressions, does not make it improper for congress to employ them. At the times of enactment of the various federal penal statutes, England and the several states have differed somewhat upon the details of the various offenses. None the less, there was a generally understood crime of "murder," "forgery," "robbery," "piracy," etc., settled in its outlines, and in most of its details, to such a degree that the federal courts could have no difficulty in fixing by its definition the meaning of those words in the federal statutes. Ball v. U. S., cited above; Moore v. U. S., 91 U. S. 270.

## CONTRACTUAL CHARACTER OF THE STATUTE SHOWN BY SECTION 6.

Section 6 of the statute in question provides: "Any property owned under any contract, or by any combination, or pursuant to any conspiracy, (and being the subject thereof,) mentioned in section 1 of this act, and being in the course of transportation from one state to another, or to a foreign country, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law." The phrase, "property owned * * * pursuant to any conspiracy," does not refer to property of the character of burglars' tools or counterfeiters' dies; that is, mere vulgar implements of crime. It means commercial property. By the procedure referred to in the section, it is not property to be destroyed, like gaming implements, but property to be sold. Nor is it property merely in the possession of conspirators; that is, property which they may have got by intimidation or robbery or assault. It is property "owned" pursuant to a conspiracy; that is, title has vested pursuant to a conspiracy. The conspiracy in the statute, therefore, is conspiracy aiming to operate by the making or the furtherance of limiting contracts, or contracts of aggregation, or monopolizing contracts.

## NARROWER MEANING OF "RESTRAINT OF TRADE" AND "MONOPOLIZE," THE MEANING OF THE STATUTE.

It has been remarked above that the phrases, "restraint of trade" and "monopolize," have each two significations in the common law,—a broader, including legal and illegal restraint and monopoly, and a narrow and invidious and highly elaborated meaning, including only certain forms of restraint and monopoly obnoxious to public policy. Such broader and narrower uses of a term in the law is very common. According to the case the court will apply the one or the other.

It is really immaterial to the defendants in this case to consider whether the broader or the narrower sense of these terms in the law is to be taken; whether the statute contemplates all restraints and all monopolies,—lawful or unlawful at the common law,—or only such restraint or monopoly as was unlawful at the common law,—since in either sense of the term the restraint or monopoly was contractual, and there is nothing of the sort in the indictment, and since the adoption of the broader meaning would justify, as will shortly be shown, the widespread popular suspicion of unconstitutionality of the act. The defendants could ask nothing better. They propose, however, to present their view of the statute. Their view is that the terms "restraint" and "monopolize" are used in the statute in their narrower and obnoxious meaning, and that the sole operation of the act, therefore, is to import into the federal jurisprudence, civil and criminal, the technical condemnatory principles of the common law (civil and criminal, respectively) in respect of restraint of trade and monopoly, in the narrower and invidious sense of those words, and pos-

sibly to extend those principles slightly beyond the realm of "trade" into the outlying zones of "commerce," or, in other words, that the statute operates precisely like most other federal illegalizing or penal statutes, merely to bring within the federal jurisdiction, to the extent of the federal constitution, principles of illegality and criminality already in full operation in the states and in the state courts.

## THE FOREGOING THE ONLY PRACTICAL CONSTRUCTION.

The statute, read literally, punishes all combinations, all contracts, in restraint of interstate or international commerce, without exception; all conspiracies in restraint of such commerce; all monopolizing, all attempts at monopolizing; all combinations and all conspiracies to monopolize any part of such commerce. Its language is sweeping and unqualified. But at the date of the passage of the act there existed, under constitutional protection, vested rights of property and of personal liberty, dependent for their existence upon a complete interstate monopoly and restraint. There were vested patent and copyright rights, not only the rights of patentees and copyright holders, but, as necessarily incident thereto, countless derivative rights of absolute monopoly and restraint. Gayler v. Wilder, 10 How. 477, 494; Machine Co. v. Morse, 103 Mass. 73; Gray, J., Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 53, 11 Sup. Ct. Rep. 478.

Existing rights of this character, both principal and derivative, although born of federal statute, are none the less rights which congress cannot disturb. U. S. v. Burns, 12 Wall. 246; Cammeyer v. Newton, 94 U. S. 225; James v. Campbell, 104 U. S. 356. There are also common-law contract rights which it is beyond the power of congress to impair. Railroad Co. v. Richmond, 19 Wall. 589.

An attempt to disturb such rights would be unconstitutional; and a statute ought, if possible, to be so construed as to make it constitutional. Presser v. State of Illinois, 116 U. S. 252, 6 Sup. Ct. Rep. 580; Parsons v. Bedford, 3 Pet. 433; Brewer v. Blougher, 14 Pet. 178; Supervisors v. Brogden, 112 U. S. 261, 5 Sup. Ct. Rep. 125; U. S. v. Central Pac. R. Co., 118 U. S. 235, 6 Sup. Ct. Rep. 1038.

Congress could not, therefore, have intended to use the words of the statute in their broad, literal sense.

But a further exclusion must be made. Even in matters not protected by the constitution, as rights of property or liberty, there are nevertheless many forms of restraint of trade, and many forms of monopoly, which the law recognizes. Under this head come many legal and partial restraints, which, by reason of their legal and partial character, are viewed as not in conflict with the policy of the law, and therefore were, at the time of the passage of the act, legal. For example, traders may lawfully allot themselves exclusive territory, (Wickens v. Evans, 4 Car. & P. 359,) or otherwise agree to "equalize" business, (Collins v. Locke, L. R. 4 App. Cas. 674,) or to restrain an unreasonable and ruinous competition, (Mogul Steamship Co. v. McGregor, Gow & Co., L. R. [1892] App. Cas. 25.)

The test, always, is whether a given restraint is reasonable or not. Assuming that congress had power to change this, and to make all such restraints and monopolies, in so far as they were not constitutionally protected rights of property, illegal and penal, it is perfectly plain that congress meant no such thing. If congress had power to make it illegal and penal for a small trader engaged in local interstate commerce to sell out his little business, and to bind himself not to renew it within 20 miles, congress certainly did not intend to do anything of the sort. Nor did congress intend to interfere at all with most of those restraints and monopolies which in the statutes have always been regarded as right and legal, such, for example, as an agreement of the publisher of an edition de luxe to limit the number of copies; or of an author not to publish a rival text-book; or of a partner, to give his exclusive attention to firm business; or of the owner of a trade secret, looking to the preservation of his secret. These and many other similar agreements would be prohibited by this statute if the broad construction were given to the term, "restraint of trade or commerce." It is patent that congress meant nothing of the sort.

It is plain, then, that congress did not intend to cover all restraints and monopolies of interstate trade. Certain restraints and monopolies must be eliminated as being vested rights; and others, as plainly outside the intention of congress. But how is the line of elimination to be drawn? Not arbitrarily, by the courts, but by rules of law, if at all. The only rules of law that can be invoked are the foregoing rules of interpretation, limiting the statute (a) to contractual restraint and monopoly; and, (b) further, to such contractual restraint and monopoly as were already illegal or criminal at the common law.

## THIS CONSTRUCTION ADOPTED IN THE LEGISLATION OF MANY STATES.

The act in question is the result of a popular agitation against the development of the modern "trust," an agitation which, since 1888, has led to the passage of similar statutes in many states. It is proper to refer to these statutes, as throwing light upon the probable intent of congress in the passage of this act. Platt v. Railroad Co., 99 U. S. 48. An examination of these statutes shows that they are in the main declaratory of the common law. As we have seen, at common law, contracts to limit competition, unduly raise prices, or reduce production, were illegal. These statutes, in terms, simply extend this principle to combinations or conspiracies to make such contracts, the object being to get around the practical difficulty of proving an actual binding contract to do these acts. In view of the secrecy surrounding "trusts," this difficulty had become a great obstacle in the way of justice. These acts simply make illegal any combination organized for the purpose of making such contracts, whether the contracts are completed or not. But in almost all it is expressly stated or implied that it is combinations proceeding by way of contract, not combinations using fraud or violence, that are within the contemplation of these statutes. The conspiracies to commit frauds or crimes were punishable by the common law of such states. The statutes referred to are: Laws Ala. 1890–1891, c. 202; Laws Ill. 1891, p. 206; Laws Iowa, 1890, c. 28; Laws Kan. 1889, c. 257; Laws La. 1890, No. 86; Laws Me. 1889, c. 266; Laws Mich. 1889, c. 225; Laws Minn. 1891, c. 10; Laws Miss. 1890, c. 36; Laws Neb. 1889, c. 69; Laws N. Y. 1892, c. 689, § 7; Laws N. C. 1889, c. 374; Laws S. D. 1890, c. 154; Laws Tenn. 1891, c. 218; Laws Tex. 1889, c. 117.

The act of July 2, 1890, intends, in its concise wording, to accomplish what the above statutes set forth at length, i. e. not to extend the range of contracts already illegal at common law, as in restraint of trade, but to punish combinations aiming to restrain interstate trade by similar contracts.

## EXCEPT ON DEFENDANTS' CONSTRUCTION, RANGE OF STATUTE ALMOST UNLIMITED.

It is a general rule of criminal law that one who is engaged in an undertaking unlawful in itself is criminally liable, not only for direct results of his action, but for results naturally flowing therefrom, indirect and uncontemplated. If A. joins B. in robbery, and B. uses such violence as to cause death, A. and B. are both liable for murder.

It is another general rule of criminal law that, where persons are guilty of a given offense, they are also guilty of a criminal conspiracy to commit that offense, and that the conspiracy is not merged in the completed offense.

It follows from these two principles that, if two or more persons join in the commission of an act of an intrinsically unlawful character, they are criminally liable—first, for the acts which they intend, and which they commit; second, for a conspiracy to commit that act; third, for indirect results; and, fourth, for a conspiracy to commit natural, although unintended, results. It follows that if two or more persons commit an act of murder, robbery, forgery, shop-breaking, store-burning, champerty, or maintenance, which in fact has a natural, although unintended, result of interference with interstate commerce, they are liable criminally for a conspiracy to interfere with interstate commerce, if the statute broadly covers conspiracy merely to interfere with it.

In most serious offenses, more persons than one are involved, and a large proportion of the serious crime, more or less directly, and often quite closely, affects interstate commerce. If, therefore, "restraint" of interstate trade and commerce in this statute means broadly interference with it, it follows that this statute operates to bring within the federal jurisdiction, in the guise of "conspiracy," a very large proportion of all the serious crime within the states.

Furthermore, where congress takes jurisdiction of a given range of crimes, its jurisdiction is exclusive of that of the states. Where it takes jurisdiction, not strictly of the crimes, but of a federal aspect of the crimes, then acts may be punished twice,—once, as a breach of state law; again, as a breach of federal law. It follows, therefore, from the government's theory of this statute, either that this statute has divested the states of jurisdiction of conspiracy in a great field of the criminal law, relating to murders, etc., or else that ordinary offenders are now liable to be punished twice,—once in the state courts, for the completed act, or for conspiracy to commit it; a second time, under this statute, in the federal courts, for conspiracy to commit it.

These singular results of the government's theory of the statute sufficiently condemn that theory. For a similar course of reasoning by the supreme court upon a question of constitutionality, see U. S. v. Harris, 106 U. S. 629, 642, at page 643, 1 Sup. Ct. Rep. 601, at pages 612, 613.

## QUESTION OF CONSTITUTIONALITY.

### The Defendants' Foregoing Construction Essential to Constitutionality, from Several Points of View.

If a federal statute undertakes to include, in one indiscriminate condemnation, classes of acts which congress can constitutionally punish, and classes of acts which congress cannot constitutionally punish, it is unconstitutional and void as to both classes of acts. U. S. v. Reese, 92 U. S. 214; U. S. v. Harris, 106 U. S. 629, 642, 1 Sup. Ct. Rep. 601; Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. Rep. 656, 763; Trade-Mark Cases, 100 U. S. 82; Virginia Coupon Cases, 114 U. S. 270, at page 304, 5 Sup. Ct. Rep. 921, 922; Leloup v. Port of Mobile, 127 U. S. 647, 8 Sup. Ct. Rep. 1380. "It would certainly be dangerous," say the supreme court, by Waite, C. J., in U. S. v. Reese, 92 U. S. 214, at page 221, "if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside, and say who could be rightfully detained, and who should be set at large."

In other words, when congress enters a given field of legislation, over which it has partial power, it must specify in its legislation what part of the field it proposes to occupy, and the part so specified must be wholly within its constitutional reach.

It goes without saying that a statute cannot be saved from the operation of this rule by construction, merely by reading into it the words, "this statute to operate so far only as it can constitutionally operate." Such a construction would nullify the rule.

It is true that there may be a federal statute, in part constitutional, in part unconstitutional, of which the constitutional part may stand, while the unconstitutional part falls. It is necessary, however, to the operation of this rule, that the constitutional and the unconstitutional parts be capable of verbal separation, so that each may be read by itself. Baldwin v. Franks, 120 U. S. 678. at page 686, 7 Sup. Ct. Rep. 656, 763; U. S. v. Reese, 92 U. S. 214, at page 221.

At the date of the passage of this act, there existed numerous vested rights, of lawful restraint and monopoly, constitutionally protected,—among them, patent, copyright, and other monopoly rights, and their derivative rights of lawful restraint, particularly referred to above,—all requiring for their existence an interstate operation. The letter of the statute covers all these rights. If, when properly construed by the rules of statutory interpretation, it still covers them, it is unconstitutional and void. It cannot be construed down, as we have seen, by the easy device of reading into it the words, "this act to operate only so far as it is constitutional." Some other narrowing rule of construction must be invoked to save it. But the only rules which can

be invoked are the rules suggested above. The only way, therefore, to make this statute constitutional, is to read its words and phrases as including, in their civil aspect, only acts already unlawful in the states, and, in their criminal aspect, only acts already criminal in the states.

The defendants' counsel have no call to argue that the statute is constitutional. But it is familiar law that, when a statute lacks literal sufficiency merely by being terse and elliptical in expression, the courts may read words into it to narrow or enlarge it. U. S. v. Kirby, 7 Wall. 482; U. S. v. Carll, 105 U. S. 611, cited above. And a statute ought, of course, if possible, to be so construed as to make it constitutional. Presser v. State of Illinois, 116 U. S. 252, 6 Sup. Ct. Rep. 580; Parsons v. Bedford, 3 Pet. 433; U. S. v. Coombs, 12 Pet. 72; Brewer v. Blougher, 14 Pet. 178; Supervisors v. Brogden, 112 U. S. 261, 5 Sup. Ct. Rep. 125; U. S. v. Central Pac. R. Co., 118 U. S. 235, 6 Sup. Ct. Rep. 1038.

The defendants' foregoing construction is essential to constitutionality from another standpoint.

Throwing out of consideration, for the moment, those lawful monopolies and restraints which are vested, and constitutionally protected, there are, we have seen, numberless lawful restraints of trade, necessarily involving interstate trade and commerce, all of which it is absurd to suppose that congress intended to cut off. To interpret the statute as cutting them off would be to make a new statute. If, among those restraints, not all of which congress intended to cut off, the statute provides no line between those which it does and those which it does not mean to cut off, the statute is unconstitutional for vagueness in undertaking to delegate its legislative powers to the courts. U. S. v. Cruikshank, cited above.

From still another point of view the statute, except upon the defendants' foregoing construction of it, is unconstitutional.

Congress cannot punish all acts of interference with interstate commerce, however remote. It is only acts having a proximate relation to a head of constitutional power that congress can take cognizance of. But, as has been stated, the line between federal and state power is in almost every direction an arbitrary line. The question of proximity or remoteness to the federal right is a matter of degree. This is peculiarly true in interstate commerce. The line between the federal and the state jurisdiction is an arbitrary and fluctuating line, and the highest courts are constantly divided upon it. The line fixed by the breaking of an original package, although a practical line, is a purely arbitrary line. The constitutional power of congressional legislation in interstate commerce begins with a vanishing line which ends in state commerce. At some point upon that line, in each class of transactions, must be fixed an arbitrary point between interstate and state commerce. Technical "restraint of trade" and "monopoly," in the unfavorable senses of those words, would be within the interstate power of congress; but not all interference with interstate trade or commerce would be within the constitutional power of congress, because it would be at the state end of the vanishing line. If the statute, when properly construed, itself provides no way of fixing the field within which it proposes to act, but undertakes to cover all interference with interstate commerce, then it covers such interference as is too remote for federal action, as well as that which is proximate. It embraces, therefore, with matters which congress can constitutionally deal with, matters which it cannot constitutionally deal with, and therefore follows under the constitutional principle now being discussed. The statute can be interpreted out of vagueness, and too great generality of reach, into constitutionality, only by restricting it to technical, contractual restraint of trade, and technical monopoly, in the unfavorable senses of those words.

It is further essential to the constitutionality of the statute that there be read into it the requirement of a specific intent to invade interstate commerce, as such, and knowledge of its character as interstate commerce, in so far as such knowledge is essential to this conscious intent.

It has been stated above that, by the ordinary rules of the criminal law, persons are criminally liable, not only for direct, but for indirect, and even uncontemplated, natural results of their action, and also for conspiracy to commit such indirect and uncontemplated results. A mere provision in a statute, or allegation in an indictment, therefore, of a conspiracy to do a certain thing,

does not necessarily require or imply actual knowledge, or a conscious, specific intent to do that particular thing. If two men, engaged in a plan of robbery, commit murder, without intending to commit it, and murder is a natural, although uncontemplated, result of their plan of robbery, they are guilty, within the meaning of the law, of a conspiracy to commit murder. This statute, therefore, taken literally, covers all cases where persons (at least when engaged in an act malum in se) reach, without knowing it, and without contemplating it, a result which amounts to restraint or monopoly of interstate trade or commerce, in whatever sense "restraint" and "monopoly" be taken. But most acts of serious wrongdoing are committed by two or more participants, and a large proportion of the serious crime more or less closely affects interstate commerce. It follows, therefore, that unless there be read into the statute a requirement of a specific intent of discrimination or attack upon federal rights, as such, every instance of robbery, burglary, murder, theft, shop-burning, store-breaking, champerty, or other act malum in se, in which there are two or more participants, which has the result, although uncontemplated, of restraining or monopolizing interstate commerce, is brought, by the act within the federal jurisdiction, under the guise of conspiracy, since every such joint act implies a conspiracy to commit it, and the conspiracy is not merged in the completed act. Without the requirement of intent and knowledge, therefore, a large proportion of the serious crime of the country may be punished under this statute, and possibly is brought by it within the exclusive jurisdiction of the federal courts. Such a range of the statute would be enormously extended by the government's theory of the loose meaning of the phrase, "restraint of trade," and "monopoly." Under that meaning, and under the principles stated above, no limits could be set to the extension of federal criminal jurisprudence effected by this act.

This reasoning forces us to the conclusion, either that the statute is unconstitutional, or that a requirement of knowledge and specific intent to invade federal rights must be read into it. U. S. v. Harris, 106 U. S. 629, 1 Sup. Ct. Rep. 601; U. S. v. Fox, 94 U. S. 315; U. S. v. Waddell, 112 U. S. 76, 5 Sup. Ct. Rep. 35; Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. Rep. 617.

In order to save the act in question, we must then read "conspiracies in restraint of trade," etc., as if written, "conspiracies to restrain trade," etc., making an essential element of the crime an intention on the part of the criminal to restrain interstate commerce. It is evident that such was the intention of congress. Section 2 of the act reads, "conspiracy to monopolize," showing that an intention to monopolize is an element of the crime. It is not probable that congress intended to give a wider scope to section 1. The natural expression would be "conspiracy to restrain." The fact that congress has departed from this natural form of words, and has used the term, "conspiracy in restraint of trade," etc., is accounted for by the reasoning of the first part of this brief, namely, that the words, "in restraint of trade," were used because of their well-known technical meaning.

## ASIDE FROM QUESTION OF CONSTITUTIONALITY, KNOWLEDGE ESSENTIAL.

A fifth limitation must be put upon the words of the statute. In terms, it covers acts of the character described, whether done with guilty knowledge or not. There are, indeed, petty police offenses in which a knowledge of the facts is not an essential to criminality, and occasionally a statute creating a serious crime has been held to dispense with the requirement of knowledge. Cases of the latter class, however, are few and exceptional, and have been made, as a rule, against a strong dissent, and against the weight of authority upon similar statutes; and invariably, where the requirement of guilty knowledge is held to be dispensed with by a statute, the decision is rested, not upon any principle of criminal law as to dispensing with knowledge, but upon a mere construction of the particular statute, in view of supposed requirements of public policy, and in all cases upon the feasibility, in the particular matter in question, of obtaining all necessary knowledge, and the propriety, therefore, in that particular field of action, of imposing upon one about to act the responsibility of inquiring into the facts, and of acting at his peril. See, in illustration of this, the decisions and the opinions in Com. v. Mash, 7 Metc. (Mass.) 472, as compared with Squire v. State, 46 Ind.

467, and Reg. v. Tolson, 23 Q. B. Div. 169, 16 Cox. Crim. Cas. 629. See, also, Reg. v. Bishop, 5 Q. B. Div. 259, 14 Cox, Crim. Cas. 404, and the curious series of recent English cases upon the subject of knowledge of age in abduction. Reg. v. Olifier, 10 Cox, Crim. Cas. 402; Reg. v. Hibbert, L. R. 1 Cr. Cas. 184, 11 Cox, Crim. Cas. 246; Reg. v. Mycock, 12 Cox, Crim. Cas. 28; Reg. v. Prince, L. R. 2 Cr. Cas. 154, 13 Cox, Crim. Cas. 138; Reg. v. Packer, 16 Cox, Crim. Cas. 57.

The opinions, and the conflicts of opinion, in most of the cases cited above, afford a striking illustration of the subtleties into which one is necessarily drawn in contending for an exceptional dispensation from the general common-law requirement of at least constructive knowledge of fact. The foregoing cases (which are all exceptional, and avowedly stand upon highly exceptional grounds) only serve to emphasize the fact of the general, and almost universal, requirement in the criminal law of knowledge of the facts. Opinions in support of a dispensation with the requirement of knowledge are invariably apologetic in language.

To the effect that the common law (unless possibly in certain forms of nuisance, Rex v. Medley, 6 Car. & P. 292; Reg. v. Stephens, L. R. 1 Q. B. 702) invariably requires knowledge of the facts as an essential of guilt, and that in statute offenses, whether adoptive of common-law offenses, or creative of new crimes, a requirement of knowledge is to be read into the statute, if not there, see U. S. v. Carll, 105 U. S. 611; Com. v. Filburn, 119 Mass. 297, (cited with approval in U. S. v. Carll, cited above;) Com. v. Stebbins, 8 Gray, 492; Reg. v. Twose, 14 Cox, Crim. Cas. 327; Rex v. Hall, 3 Car. & P. 409; Levet's Case, 1 Hale, P. C. 42; Reg. v. Langford, Car. & M. 602, 605.

This statute was never intended to punish persons who join together, under an innocent mistake of fact, to enforce what they believe to be a rightful exclusive title in them. If the purchaser of an alleged trade secret believes it to be in fact a secret, and believes that an executor or trustee who sold it to him had a right to sell it, and, if he attempts thereunder to restrain trade by a limiting contract, or to monopolize it, he is not within this statute, even though mistaken in his facts. If he is within it, then an indictment will lie against every patentee who attempts to enforce his patent, if in fact his patent is invalid through priority or some other fact unknown to him; and no patentee can attempt to enforce his rights except at his peril, and at the risk of an infamous punishment in case he turns out to have been ignorant of some prior use, which he could not by the strictest diligence have ascertained, or have supposed to have been made.

It is to be observed that if the knowledge required under the statute now in question is almost necessarily a knowledge of a conclusion of fact, or of mingled law and fact, namely, a knowledge of right and title, or of a lack of right and title, knowledge of this character comes as fully within the general rule as to knowledge as does knowledge of pure and simple fact. In Com. v. Stebbins, Reg. v. Twose, Rex v. Hall, Levet's Case, all cited immediately above, the matter of "fact" was a conclusion of law and fact; namely, a question of title.

It is to be further observed that the knowledge required is not knowledge that the defendants are combining and acting in concert, but knowledge of the facts which make their combining or acting in concert penal. Persons acting in concert, but acting innocently, by reason of ignorance of facts, necessarily know that they are acting in concert; but that is not the knowledge which the law requires.

Knowledge, furthermore, under this statute, must comprise knowledge, also, that the trade or commerce proposed to be restrained or monopolized is of a lawful character, and lawful in the hands of the rivals who carry it on, or are to carry it on, and knowledge that the commerce to be interfered with exists, or is to exist.

## ON GENERAL PRINCIPLES, WRONGFUL INTENT ESSENTIAL.

One thing more must be read into this statute; namely, intent to fix, control or raise prices to the injury of the public, or in some way to injure or defraud the public.

In the case of the monopoly counts, the requirement would seem to flow from the very meaning of the word "monopolize," for that word, as used in the criminal law, it would seem, involves a wrongful intent, just as "uttering."

As to the requirement of an intent to injure and defraud the public, and by raising of prices, in all trade offenses, see authorities.

Indeed, the requirement of a guilty intent, or, as it is technically characterized, the "mens rea," in all serious offenses, (not of a highly exceptional character, like Rex v. Ogden, 6 Car. & P. 631; Reynolds v. U. S., 98 U. S. 145; Reg. v. Downes, 13 Cox, Crim. Cas. 111,) is so nearly universal, whether specified in a statute publishing the offense or not, that it is to be read, as a matter of course, into every statute, unless there are highly exceptional grounds of public policy, in a particular offense, for dispensing with it.

## AN INTENDING BENEFICIARY ESSENTIAL.

It is a further essential, under the statute, that the contemplated restraint should be a restraint operating and intended to operate, by the very terms and operation of the restraint, to the benefit of some specific person or persons. The statute punishes, not interference with trade, but a "restraint" of trade, and "restraint of trade," ex definitione, implies a conscious beneficiary. So the crime of monopoly implies a person who is consciously to monopolize. He does not monopolize who exterminates trade, but only he who contractually gathers trade into his own hands, or into the hands of some one in concert with him. There can be no monopolizing without an intentional monopolizee.

## SUMMARY OF THE ESSENTIALS OF THE CRIME.

The statute, when properly construed, requires, therefore, i1 conspiracy under it:

1. That the trade or commerce aimed at be technically interstate commerce.

2. That the persons or things dealt with consciously be dealt with in their federal, and not in their state, aspect.

3. That a contemplated restraint or monopoly be a contractual restraint or monopoly; that is, that the conspiracy must consist in contract, or aim at the making or the enforcement or the furtherance of contracts.

4. That the contemplated restraint or monopoly be a restraint or monopoly, excessive in degree, and unlawful at the common law.

5. That the trade or commerce proposed to be restrained or monopolized be a lawful trade or commerce.

6. That the defendants have (a) knowledge that they or their privies have no patent or other exclusive title or right to the trade or commerce proposed to be restrained or monopolized; (b) knowledge that the trade or commerce proposed to be restrained or monopolized is unlawful, and lawful to those carrying it on in the given instance; (c) knowledge that the commerce in question is interstate commerce.

7. An intent, by unduly raising prices or otherwise, to injure and defraud the public by the contemplated restraint or monopoly, and an intent to restrain interstate commerce, as such.

8. An intending and conscious beneficiary of the contemplated restraint or monopoly.

## THE INDICTMENT.

The indictment avers none of the essentials of crime above set forth, and violates every one of the rules of pleading above cited.

1. The alleged contemplated restraint and monopoly was not contractual restraint or monopoly, but a mere rude and vulgar attack upon trade or traders by force, fraud, libel, and slander.

2. No count sets forth such means of effecting the proposed conspiracy as, if carried out, would be, in any reading of the statute, a restraint or monopoly of interstate trade or commerce. Some of the counts set forth no means at all, or set forth means so vaguely and generally as to be patently

bad in this respect. Those counts which undertake to set forth means entirely fail to bring the persons, matters, and things alleged to have been proposed to be dealt with within the definition of "interstate commerce," or its subjects or instruments, or within the federal or interstate aspect of those persons, matters, or things, as distinguished from their state aspect. It does not follow, because one is engaged in interstate commerce, that every attack upon him, or upon any part of his business, is an attack upon interstate commerce. The attack may be upon him in his aspect as a subject of the state, and upon his matters or things only in so far as they are matters of mere state commerce. The indictment assumes that a person engaged in interstate commerce is exclusively engaged in it, and has no other aspect than that of a person engaged in interstate commerce, and that an interference with him, or with any part of his matters or things, is an interference with interstate commerce. Assuming it to be true that interferences with a person, or with matters or things, concerned in local commerce, may, by their necessary connection with certain interstate commerce, be proximate attacks upon interstate commerce, the connection must be established by specific allegations of the indictment. It is not to be inferred. The indictment in this respect is entirely based upon a fallacy upon which the statutes and indictments were based in U. S. v. Cruikshank, U. S. v. Harris, and U. S. v. Fox; namely, the fallacy that the having a federal aspect brings a person and his matters and things within federal protection in all their aspects.

3. It does not appear by any count of the indictment but that the defendants had, or were acting under some one who had, an exclusive right to all trade and commerce, or all interstate trade and commerce, among the states, at least as against the alleged rivals. The defendants may have had a patent covering the cash registers, if any, in which the corporations named as proposed to be attacked dealt, if they did deal, or the defendants, or some one privy with them, may have had exclusive patent license for interstate trade in such registers from the various corporations, or from a patentee under whom all claimed title, or the defendants, or some one privy with them, may have bought out a good will or a trade secret from these corporations, or from some one under whom all parties claimed, covering the cash registers, if any, dealt in by said corporations. An indictment in the same terms as this indictment would lie to-day against every patentee in the country, and his agents; and against Emerson's publisher and legatees; against every one who has bought out a local good will; against every owner of a trade-mark; in fact, against everybody who owns anything which is the subject of interstate commerce.

4. It is not averred that the commerce, if any, being carried on, or proposed to be carried on, by said corporations, other than the National Company, was a lawful commerce. It may have been in violation of a limited and lawful contract made by them, of restraint, or of division of territory.

5. The interstate commerce (an essential of this crime, and a jurisdictional essential) is alleged only as a conclusion of law. It leaves it for the prosecutor, and not for the court, to decide whether what the prosecutor considers interstate commerce is "interstate commerce," and of the statute's character, or not. But that "is a question of law, to be decided by the court, not the prosecutor." Waite, C. J., U. S. v. Cruikshank, cited above.

6. It is in no count alleged, even as a conclusion of law, that the "trade and commerce * * * between and among the several states" alleged to have been aimed at (granting that it was such) was within that limited class of commerce among the several states which alone the statute covers. As has been suggested above, the phrase, "commerce among the several states," as an expression of language, accurately includes a great deal of commerce which is not within the meaning of the phrase, as used in the constitution, and is even less within the still more restricted meaning of the phrase in the statute. The indictment, therefore, runs counter, in this respect, to the rule of pleading that where a statute covers, in terms, a whole class of things, but really intends only a subdivision of the class, the indictment must bring the things which it alleges within the subdivision. The only way to allege interstate commerce in an indictment is the way attempted in the

first four counts of an indictment previously found in this district against these defendants, (No. 1,209,) viz. by describing in detail the operations supposed to constitute interstate commerce. In that former indictment the pleader was in this particular on the right track, although his pleaded facts were insufficient to make out interstate commerce.

It is not open to the government to contend ·     the court can judicially know that there was, or was proposed to be, a       ·rce "among the several states," of the statutory character, in "cash r ·sters." There are articles in which the court may, perhaps, be said to know, as matter of law, that there is at all times such commerce. With "cash registers" it is different. It is very doubtful if the court can be said to know what a "cash register" is. It is certainly difficult to see how the court can know in what sense the term is used in this indictment. Until lately the only meaning which the phrase would suggest is that of an account book for cash entries. Now, in so far as the indictment may be deemed to refer to books of cash entry, the court cannot know that there was at the time in question interstate commerce, or expected or proposed interstate commerce. Blank cash books may be all manufactured and sold within the legal limits of state commerce. The absence of a specific allegation of interstate commerce, therefore, in this meaning of the term "cash register," would be fatal. If the court should take the expression "cash register" in the indictment in a broader sense, as including both account books and also mechanical contrivances, then the indictment, as will be more particularly contended below, under an appropriate head of this brief, would fail, for indefiniteness; for the defendants ought certainly to be apprised whether it is a commerce in machinery, or a commerce in blank books, that they are charged with attacking. If the court should find, upon the face of the indictment, that the "cash registers" referred to in the indictment are the mechanical devices recently introduced into the market, the court will surely apply, as judicial knowledge, not a fraction, but the whole, of its actual knowledge, and will judicially know that these new mechanical devices profess to exist under letters patent; that the different manufacturers claim under patent rights; and that the questions of free or restricted commerce, and of monopoly or no monopoly, are mere questions of patent controversy,—a field of controversy never contemplated by the act of 1890.

If an indictment were to allege, on the part of the Bell Telephone Company and its officers and agents, a conspiracy to restrain the trade and commerce of all other persons, and to monopolize to themselves and their company the trade and commerce in "Bell telephones," would not the court, if it applied to the indictment judicial knowledge that there are such telephones, and that there is commerce of the statutory character in them, also apply judicial knowledge of the fact of a lawful monopoly, and an exclusive right to commerce in them, or at least a bona fide claim thereto, not to be tried under a penal statute?

These counts present also the defect (which exists in the other counts) of failing to allege that the commerce was proposed to be continued. It is future transactions which a conspiracy contemplates, and there is no allegation that the commerce of these counts was proposed to be continued from and after the time of the alleged conspiracy. It is fatal to a conspiracy indictment that the object of the conspiracy may have been a myth.

7. No count of the indictment has any averment of knowledge or intent. If the offense necessarily involve knowledge and intent, they must be alleged. An indictment, for example, for conspiracy to commit burglary, must aver a conspiracy, not merely to break and enter a dwelling house in the nighttime, but a conspiracy to break and enter with intent to steal.

8. No count alleges a proposed contractual beneficiary of the contemplated restraint or monopoly. It does not appear that the defendants were in the business, or had any control of the business, or that the National Cash Register company was a party to the conspiracy, or knew of it, or would consent to profit by it. It is not made a defendant, although the statute contemplates corporations. It stands, upon the restraint counts, (counts 1 and 2,) as a mere unconscious, passive, proposed beneficiary, without whose acceptance and co-operation and indorsement there can be no restraint. It

is not alleged that the defendants conspired merely to extinguish the trade of the other corporations. It appears that they combined, if at all, merely to subordinate their trade to that of the National Company; but, in the absence of averments bringing in the National Company as a willing beneficiary, this restraint would be impossible. The averments of the restraint counts are therefore, in this respect, imperfect, absurd, and impossible.

The crime of monopoly implies a conscious monopolizing. A conspiracy of several men, without any knowledge, to drive all the trade in town into my shop, out of love for me, or out of hatred of my rivals, but without my knowledge, and without benefit to the conspirators, is an unlawful conspiracy, under state laws, against the right of my neighbor to live a peaceful life, but it is not a conspiracy to monopolize. It is not averred here that the defendants were in a position to or expected or intended to monopolize into their own personal pockets. There is a faint hint that the intended monopolizer was the National Company, but only a hint.

Acceptance of a benefit may indeed sometimes be presumed by law; but a corporation, any more than an individual, will not be presumed to have accepted itself into a criminal combination.

It is a universal rule, as to those crimes which consist in contract, or combination, or meeting of minds, that there must be, not a mere fictitious appearance of a meeting of minds, but an actual contract, or other meeting of minds, as in civil transactions.

Where the statute speaks of monopolizing "a part of the trade," it must mean the whole of a specific part; for while the word "monopolize" is not to be taken in a mathematically exact sense, requiring that a monopolist of flour should have, or intend to have, every teaspoonful of flour in the United States, it does mean a substantial control of a great part of any one given article, or enough to enable him to dictate to the market. The monopoly alleged in counts 5 to 11 and 15 to 18 is merely a monopoly of the business of five corporations named. It does not appear how much business they did, or what proportion it bore to the whole business of the country in cash registers. It is consistent with the indictment that it was extremely trifling, and that to secure the whole of it would not constitute the offense of monopolizing. Men cannot be indicted for combining to monopolize wheat by a mere averment that they combined to monopolize certain wheat when owned by A. B. Nothing essential is to be assumed, in a criminal case. The names of the rival companies sound well, but the court does not know that they did any appreciable amount of business. The defendants, for all that appears in the indictment, are Mrs. Partingtons attempting to sweep back the Atlantic ocean. It should have been shown that the monopolizing the business of the alleged rival companies would have amounted to a monopolizing of the business in cash registers. Moreover, upon the language of these counts, a monopoly may well have been impossible. There is no averment that the National Cash Register Company was to be interfered with, and, for all that appears, it was not known to the transaction. It may well have been entirely vain for the defendants, if they left the National Company free, to attempt to monopolize the cash register business, even if they monopolized the business of the other companies. Perhaps it had 99 per cent. of the whole business. If so, without its co-operation, monopoly would be impossible.

9. This is a patent suit. Congress never intended, under this statute, to try patent controversies to a jury, in a criminal court. An indictment might undoubtedly be so drawn as properly to bring into a criminal case a plain and simple issue, to the effect that the defendants claimed under a patent, but had no pretense, color, or show of a patent, and held no letters patent, and no license under any letters patent. But here some of the counts aver that the defendants justify under letters patent. There is no averment that the patent claim is not valid, and the question raised by these counts must therefore resolve itself into a question of validity, or the construction, or both, of the letters patent. These counts, therefore, seem calculated to launch the court into a controversy before a jury over a complicated tissue of patent questions, which might occupy a long time in trial. This was never intended. When patents appear in an indictment, as an invalid pretense or justification, it

should be alleged that the claim set up under them is a mere sham claim, and only colorable.

10. The indictment is bad for vagueness and uncertainty. In no count does it approximate to the particularity and certainty required by the courts of the United States, and emphasized particularly in U. S. v. Simmonds, 96 U. S. 360; U. S. v. Cruikshank, cited above.

In some of the counts the defendants are simply charged with conspiring to restrain or to monopolize certain commerce. Among what states it was, by whom carried on, or proposed to be carried on, or where or how to be restrained or monopolized, these counts do not disclose. The other counts specify the trade or commerce as being carried on by four corporations named, but where, and among what states, these counts do not disclose. Nor does the character of the "cash registers" appear. Were they machines, or tally boards, or books? Tested by the requirement that the defendants must be sufficiently apprised of the details of the charge against them to enable them to prepare for trial, all the contents are bad. In U. S. v. Simmonds, cited above, one was charged having "caused and procured" a still to be used. It was held that he was entitled, under the requirements of criminal pleading, to know whom he was charged with having caused or procured to use the still.

10. It is not averred in any count to what extent trade was carried on. Can the court assume, in a criminal case, an appreciable amount of commerce of the statutory character?

PUTNAM, Circuit Judge. I do not think there is any constitutional question in this case upon any view of this statute, or upon the face of the indictment. The right of free commerce granted by the constitution (Crandall v. Nevada, 6 Wall. 35, and the Case of State Freight Tax, 15 Wall. 232) permits broad legislation; and in no sense is this statute as broad as the Revised Statutes (section 5508) on the principle of construction applied to the latter in U. S. v. Waddell, 112 U. S. 76, 5 Sup. Ct. Rep. 35. See Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. Rep. 617. There may be practical difficulties in applying the statute in such way as to prevent conflicts with state jurisdictions, but these can only arise on the development of the facts at the trial of a particular case, and even then the court will have the guidance of the supreme court in Re Coy, 127 U. S. 731, 8 Sup. Ct. Rep. 1263; Cross v. North Carolina, 132 U. S. 131, 10 Sup. Ct. Rep. 47; and In re Green, 134 U. S. 377, 10 Sup. Ct. Rep. 586. Those cases show that there need not necessarily be a conflict of jurisdiction.

This statute is not one of the class where it is always sufficient to declare in the words of the enactment, as it does not set out all the elements of a crime. A contract or combination in restraint of trade may be not only not illegal, but praiseworthy; as, where parties attempt to engross the market by furnishing the best goods, or the cheapest. So that ordinarily a case cannot be made under the statute unless the means are shown to be illegal, and therefore it is ordinarily necessary to declare the means by which it is intended to engross or monopolize the market. And by the well-settled rules of pleading it is not sufficient to allege the means in general language, but, if it is claimed that the means used are illegal, enough must be set out to enable the court to see that they are so, and to enable the defense to properly prepare to meet the charge made against it.

I regard the rule laid down by the supreme court in U. S. v. Hess, 124 U. S. 483, 8 Sup. Ct. Rep. 571, as applying to this case; and I

think the case of U. S. v. Simmonds, 96 U. S. 360, is easily distinguished. If it is not, the later case will, of course, control. In reference to the suggestion of the counsel for the United States, as to cases at common law alleging conspiracy to prevent a man from pursuing his trade, it is sufficient to say that to conspire to prevent a man from pursuing a trade which he is entitled to pursue is in itself illegal. But the case at bar is not at common law, and the proceedings under this statute are peculiar to the statute. I think the rules laid down in U. S. v. Hess distinguish this indictment on this point from all the cases and principles of law relied on by the United States. The allegations of what was done in pursuance of the alleged conspiracy are under this particular statute irrelevant, and cannot be laid hold of to enlarge the necessary allegations of the indictment, and are of no avail. I think it was so conceded at the argument. If not, there is no question about the law. The foregoing considerations dispose of counts 1, 2, 3, 6, 7, 8, 11, 12, 13, 15, 16, and 17.

That the means are alleged with "reasonable precision" in the remaining counts, appears from the practical application of the rules of pleading appropriate to this case made in U. S. v. Waddell, 112 U. S. 76, 5 Sup. Ct. Rep. 35. Some of the allegations in each count may be insufficient, but these are only surplusage.

Counts 14 and 18 seem sufficient under the second section of the statute, as will appear from what I have to say hereafter. The remaining counts, 4, 5, 9, and 10, are laid under the first section. Counts 4 and 9 allege an intent to hinder and prevent all persons and corporations, except the corporation controlled by the defendants, from engaging in the trade and commerce described in the indictment, while counts 5 and 10 only allege a purpose to destroy the competition of the four corporations named, without setting out any purpose of engrossing or monopolizing the business as a whole, or any like purpose.

The court does not feel at all embarrassed by the use of the words "trade or commerce." The word "commerce" is undoubtedly, in its usual sense, a larger word than "trade," in its usual sense. Sometimes "commerce" is used to embrace less than "trade," and sometimes "trade" is used to embrace as much as "commerce." They are, in the judgment of the court, in this statute synonymous. The court is well aware of the general rule which has been several times (twice certainly) laid down by the supreme court of the United States, that in construing a statute every word must have its effect, and the consequent presumption that the statute does not use two different words for the same purpose; but this rule has its limitations, and it is a constant practice for the legislature to use synonyms. A word is used which it is thought does not perhaps quite convey the idea which the legislature intends, and it takes another word, which perhaps has to some a little different meaning, without intending to more than make strong the purpose of the expression in the statute.

In the legislation of congress analogous to this under consideration there is a marked case of the use of synonyms. Rev. St. § 5438,

uses the words "false, fictitious, or fraudulent;" then the words "any false bill, receipt, voucher;" then the words "agreement, combination, or conspiracy;" then the words "charge, possession, custody, or control," mainly synonyms; while section 5440 uses simply the word "conspire." There would be no question that the word "conspire," in section 5440, means all that the three corresponding synonyms, "agreement, combination, or conspiracy," mean in section 5438. Rather as a matter of curiosity than because they particularly impress my mind, I have taken off some other instances. The Massachusetts statute cited in U. S. v. Britton, 107 U. S. 670, 2 Sup. Ct. Rep. 512, uses the words "secular labor, business, or employment." The words "false, forged, and counterfeited" are used over and over again in U. S. v. Howell, 11 Wall. 436, 437; "peddler and hawker" are in constant use in criminal law; "drinking house or tippling house" is of frequent use in the statutes; so are "goods and chattels." These are all referred to in Bishop on Statutory Crimes as synonymous. There is also the very special case where the criminal statute contained the words "ram, ewe, sheep, and lamb;" and it was held in Reg. v. McCulley, 2 Moody, Cr. Cas. 34, that the word "sheep" covered the two preceding words, and they might be rejected as surplusage. Sutherland on Statutory Construction says that words which are meaningless have sometimes been rejected as redundant or surplusage. So in this statute I think the words "trade or commerce" mean substantially the same thing. But the use of the word "trade" nevertheless is significant. In my judgment, it was probably used because it was a part of the common-law expression, "in restraint of trade," as has been carefully pointed out by the counsel for the defense. This has become a fixed, well-known, common-law expression; and by the rule of interpretation as given again in Sutherland on Statutory Construction (section 253) it has been here used in the sense in which it has been used generally in the law. And these words, "in restraint of trade," lead up directly to what I think is the true construction of this statute on this point.

I think it is useful to analyze the statute. Separating it into parts, we have—First, contract in restraint of trade; second, combination in restraint of trade; and, third, conspiracy in restraint of trade. There can be no question that the second and third parts, as thus put, receive color from the first. Moreover, it is important to note the rule that this whole statute must be taken together. The second section is limited by its terms to monopolies, and evidently has as its basis the engrossing or controlling of the market. The first section is undoubtedly in pari materia, and so has as its basis the engrossing or controlling of the market, or of lines of trade. The sixth section also leads in the same direction, because it provides for the forfeiture of property acquired pursuant to the conspiracy. Undoubtedly the word "conspiracy" in that section has reference to the same subject-matter as in the first. If the intention of the statute was that claimed by the United States, I think the natural phraseology would have been "to injure trade," "to restrain trade."

We are now at the point where the paths separate. Careless or inapt construction of the statute as bearing on this case, while it may seem to create but a small divergence here, will, if followed out logically, extend into very large fields; because, if the proposition made by the United States is taken with its full force, the inevitable result will be that the federal courts will be compelled to apply this statute to all attempts to restrain commerce among the states, or commerce with foreign nations, by strikes or boycotts, and by every method of interference by way of violence or intimidation. It is not to be presumed that congress intended thus to extend the jurisdiction of the courts of the United States without very clear language. Such language I do not find in the statute. Therefore I conclude that there must be alleged in the indictment that there was a purpose to restrain trade as implied in the common-law expression, "contract in restraint of trade," analogous to the word "monopolize" in the second section. I think this is the basis of the statute. It must appear somewhere in the indictment that there was a conspiracy in restraint of trade by engrossing or monopolizing or grasping the market, and it is not sufficient simply to allege a purpose to drive certain competitors out of the field by violence, annoyance, intimidation, or otherwise.

Something has been said in this connection touching the debates in congress. It is apparently settled law that we cannot take the views or purposes expressed in debate as supplying the construction of statutes. In U. S. v. Union Pac. R. Co., 91 U. S. 72–79, and elsewhere, the supreme court has laid down this rule. But this does not at all touch the question whether or not one can gather from the debates in congress, as he can from any other source, the history of the evil which the legislation was intended to remedy. The debates on this point are very instructive; but they fail to point out precisely what incidents or details of the great evil under consideration were to be reached by this legislation.

What I have already said disposes of counts 5 and 10, which do not allege any purpose except to destroy the competition of four corporations named; and they leave for consideration only the counts 4 and 9, which do allege a purpose of engrossing, monopolizing, or grasping the trade in question. Such being the case, acts of violence and intimidation may be alleged as means to accomplish the general purpose. Instead of lying outside of the statute, they may aggravate the offense. They are within the logic and spirit of the statute, which are not to be defeated by distinctions which its letter does not suggest to the ordinary mind. Violence and intimidation are as much within the mischief of the statute as negotiations, contracts, or purchases. The former are often used to compel the latter. This line of reasoning applies to both the first and second sections, and finds a sufficient place for every word in each. I find in all the counts which I allow to stand, allegations of an intent to engross, monopolize, and grasp, and of means clearly unlawful, and adapted to accomplish this intent.

I have examined all the cases which have been cited to me as referring to this statute, and I believe that counsel have cited me every case which has been decided in connection with it; but none of them meet the issue which is raised here. Therefore all the expressions in them supposed to touch this case are to be regarded as mere dicta. The result is that counts 4, 9, 14, and 18 stand, and the others are quashed.